# IN THE SUPREME COURT OF IOWA

No. 21–0652

Submitted March 23, 2022—Filed June 30, 2022

**GORDON BERG GARRISON,**

Appellant,

vs.

**NEW FASHION PORK LLP** and **BWT HOLDINGS LLLP,**

Appellees.

Appeal from the Iowa District Court for Emmet County, Charles Borth, Judge.

A farmer appeals a summary judgment order dismissing nuisance, trespass, and drainage claims against a neighboring confined animal feeding operation. **AFFIRMED.**

Waterman, J., delivered the opinion of the court, in which Christensen, C.J., and Mansfield and McDermott, JJ., joined. Mansfield, J., filed a concurring opinion, in which Waterman, J., joined. Appel, J., filed a dissenting opinion, in which Oxley, J., joined. McDonald, J., filed a dissenting opinion, in which Oxley, J., joined.

Wallace L. Taylor (argued), Cedar Rapids, and David A O'Brien, Dave O'Brien Law, Cedar Rapids, for appellant.

James W. White (argued), James L. Pray, and Jennifer E. Lindberg of Brown, Winick, Graves, Gross & Baskerville, P.L.C., Des Moines, for appellees.

Eldon L. McAfee and Julie Vyskocil of Brick Gentry, P.C., West Des Moines, for amicus curiae Iowa Pork Producers Association.

Christina L. Gruenhagen of Parker & Geadelmann, P.L.L.C., West Des Moines, for amicus curiae Iowa Farm Bureau Federation.

**WATERMAN, Justice.**

In this appeal, the defendants and amici curiae renew prior invitations to overrule *Gacke v. Pork Xtra, L.L.C.*'s controversial three-part test under the inalienable rights clause, article I, section 1 of the Iowa Constitution. 684 N.W.2d 168, 177–79 (Iowa 2004). *Gacke* created the test to adjudicate constitutional challenges to the statutory immunity enacted in our state's "right-to-farm" legislation, Iowa Code section 657.11 (2020).

The plaintiff in this case sued the neighboring confined animal feeding operation (CAFO) twice. The first lawsuit was in federal court and was dismissed on summary judgment for lack of expert testimony supporting the plaintiff's claims that the CAFO's manure runoff caused excessive nitrate levels in an ongoing violation of federal law. The federal court declined supplemental jurisdiction over his state law claims. The plaintiff then refiled his lawsuit in Iowa district court alleging common law nuisance, trespass, and drainage law violations. The CAFO defendants moved for summary judgment based on the statutory immunity in Iowa Code section 657.11 and the plaintiff's lack of evidence to establish he qualified for an exception to the immunity or prove causation or damages. The plaintiff, relying on *Gacke*, argued section 657.11 as applied to him is unconstitutional under Iowa's inalienable rights clause.

The district court rejected the plaintiff's constitutional challenge after determining he failed to satisfy the three-part test in *Gacke* because his own CAFO had benefited from the immunity. The court then granted the defendants' motion for summary judgment because the plaintiff lacked expert testimony or

other evidence to support any exception to the statutory immunity defense or to prove causation or damages. We retained the plaintiff's appeal.

On our review, for the reasons explained below, we affirm the summary judgment. We overrule *Gacke*'s three-part test and apply rational basis review to reject the plaintiff's constitutional challenge to section 657.11 under the inalienable rights clause. We conclude the plaintiff failed to preserve error on his takings claim under article I, section 18 of the Iowa Constitution and failed to generate a question of fact precluding summary judgment on statutory nuisance immunity or causation for his trespass and drainage claims. We need not and do not reach the plaintiff's constitutional challenge to the damages limitations in section 657.11A(3).

## I. Background Facts and Proceedings.

In 1972, Gordon Garrison purchased approximately 300 acres of farmland in Emmet County. He lives on the property in a home built in 1999. Garrison has a bachelor's of science in agricultural engineering from Iowa State University. From the 1970s to 2018, he raised sheep on his property. Garrison at one point owned a 500-head ewe flock and could have over 1,000 animals on his property each birthing season. The sheep were kept in a barn most of the winter. After the 1980s, the size of his flock began to decrease. Garrison initially disposed of the sheep manure by spreading it on his fields. He later transitioned to using a manure compost pile, which remains on his property.[1] Some of his

---

[1]The record did not include any formal complaints Garrison received from nearby landowners regarding his manure compost pile. The defendants' director of environmental

land continues to be farmed, but most of his acreage "is being cared for in restoration of the 'Prairie Pothole' ecology that was indigenous to northwest Iowa."

Garrison, with his family, owns and leases another 260 acres in Kossuth County and 360 acres in Wright County. Garrison had a handshake agreement allowing the renter in Kossuth County to apply manure to the fields at agronomic rates. The renter in Wright County applied manure to fields without Garrison's permission. Neither operation generated any nuisance claims by neighbors.

In December of 2015, New Fashion Pork (NFP) started operating a CAFO. The CAFO is uphill and adjacent to Garrison's property. NFP's subsidiary, BWT Holdings, owns additional land adjacent to Garrison's property for disposal of manure. The confinement building is approximately a half-mile away from Garrison's property line and is permitted to hold 4,400 to 8,800 hogs depending on their weight. The defendants put pattern tiling in the BWT property, which Garrison claims led to substantially more drainage flowing to his property.

According to Garrison, in the fall of 2016, NFP's "manure application was done when the field was saturated with water so the field could not absorb the manure and the manure discharged to [his] property." In December 2018, NFP applied manure to frozen ground in violation of state regulations. The Iowa Department of Natural Resources entered a consent order under which the defendants paid an administrative penalty of $4,800 for that violation.

---

services mentioned he could smell manure from Garrison's property and had considered "planting trees on the north property line to protect our residence from his odor."

From 2016 to 2020, Garrison documented the times on his property that he smelled the CAFO's odor. He estimated that he could smell its odor more than 100 days of the year, sometimes all day. The odor interferes with his enjoyment of working outdoors, going on walks around his property, and his sleep. His son confirmed the odor can be very pervasive depending on the wind direction.

The defendants undertook several measures to ameliorate the odor. NFP adjusted the placement of pit fans. In August of 2016, NFP installed an electrostatic precipitating fence on the side of the confinement building facing Garrison's property. That fence was the first of its kind on a hog farm.

Garrison took water samples from a stream that flows through his land from BWT's property. From 2001 to 2013, Garrison took thirty-two samples at irregular intervals in accordance with his training from the IOWATER program. From April 15, 2016 to June 20, 2019, Garrison took water samples from the same stream at more regular intervals and sent the samples to be tested by the Iowa State Hygienic Laboratory. According to Garrison, "[a]ll the samples, with one exception when chicken litter was applied to the Sanderson field, had nitrate levels of 10 ppm or less." The samples tested by the Iowa State laboratory have on average higher nitrate levels than Garrison's samples collected before 2013. The Iowa State laboratory samples show a substantial, consistent decrease in nitrate levels from 2016 to 2019 and do not show a spike in nitrate levels that would correlate with NFP's manure spreading in 2016 or 2018.

On December 20, 2018, three years after the CAFO began operating, Garrison filed a lawsuit against NFP and BWT in the United States District Court

for the Northern District of Iowa. Garrison alleged the CAFO violated the Resource Conservation and Recovery Act (RCRA), the Clean Water Act (CWA), and multiple state laws. The defendants moved for summary judgment. The federal court found that Garrison relied exclusively on his water tests to attempt to "create a genuine issue of material fact about the ongoing nature of defendants' actions," the "water tests do not show a pattern of ongoing violations," the nitrate levels do not correlate with annual or biannual manure applications, and the 2016 and 2018 incidents are past (not ongoing) violations. *Garrison v. New Fashion Pork LLP*, 449 F. Supp. 3d 863, 873–74 (N.D. Iowa 2020). The federal court elaborated:

> [P]laintiff has not designated any expert to testify about the nitrate levels or specifically about the issue of causation. Even if the Court allows each of plaintiff's proposed experts' testimony in its entirety, plaintiff cannot link the nitrate levels in the water tests to misapplication of the manure. Plaintiff's proposed experts discuss manure management plans and soil drainage issues, but the Court finds no expert testimony in the record linking defendants' alleged overapplication or misapplication of manure to higher levels of nitrates in plaintiff's water tests. Although taking water samples and testing them for nitrates may not require scientific or specialized skill, interpreting the results does require expert analysis. Here, plaintiff has provided no expert testimony, admissible or not, tying defendants' alleged misapplications or overapplications of manure to the nitrate levels in the stream on plaintiff's property. Plaintiff has also not established a baseline to show that the nitrate levels are occurring at a higher rate than before defendants started spreading manure or at a higher rate than would be expected to naturally occur. Without an established baseline or metric there is no evidence that the nitrate levels are occurring at a higher rate attributed to runoff from defendants' fields.

*Id.* (record citation omitted). Noting "RCRA and the CWA do not support citizen suits for wholly past violations," *id.* at 874, the federal court granted the defendants' motion for summary judgment dismissing Garrison's federal claims

because there was no "genuine issue of material fact as to any current and ongoing violations of RCRA and the CWA," and declined to exercise supplemental jurisdiction over Garrison's state law nuisance, trespass, and drainage claims, *id.* at 870, 874–75. Garrison did not appeal the federal court judgment.

On June 1, 2020, four-and-a-half years after the CAFO began operating, Garrison filed this civil action in the Iowa District Court for Emmet County alleging he is entitled to damages because NFP and BWT created a nuisance, trespassed on his property, and violated Iowa's drainage laws. Under the nuisance claim, Garrison alleged he was entitled to damages because of the CAFO's odor for "the devaluation of his property" and his loss of "use and enjoyment of his property." Under the trespass and drainage claims, Garrison alleged NFP over-applied manure and the defendants' increased drainage trespassed onto his land. On August 31, the defendants filed their answer and alleged, in part, that Garrison's "claims are barred, in whole or in part, by Iowa Code § 657.11(2)" and "barred by res judicata, issue preclusion and/or claim preclusion." The defendants filed an amended answer on January 21, 2021, and further alleged that Garrison's "claims are barred, in whole or in part, by Iowa Code § 657.11A(3)."

Garrison moved to strike the defendants' affirmative defenses, arguing section 657.11(2) and section 657.11A(5) are unconstitutional as applied to him under the inalienable rights clause of the Iowa Constitution and that section 657.11A(3)'s damage cap is unconstitutional on its face and as applied. His motions did not rely on the takings clause in article I, section 18 of the Iowa

Constitution. Garrison also filed a motion in limine to exclude evidence of his ownership of the Kossuth County property and manure spreading at that location, and the manure pile on his farmland in Emmet County. The defendants resisted the motions and argued that *Gacke* should be overruled.

On March 8, the defendants moved for summary judgment arguing that they were entitled to the protections in sections 657.11 and 657.11A and that Garrison's trespass and drainage claims fail as a matter of law, as the federal court already determined. Garrison resisted by arguing the defendants are not entitled to statutory immunity protection, issue preclusion does not apply, and the water tests and additional evidence create a genuine issue of material fact. On April 6, the district court issued an order denying Garrison's facial challenge to section 657.11A(3)'s cap on damages and denying his motion in limine. The court reserved the issue of Garrison's as-applied challenge under the inalienable rights clause. The court held an evidentiary hearing on April 9.

Garrison submitted several expert reports and affidavits. Roger Patocka, a professional engineer, opined that "precipitation does accumulate on the BWT Holdings tract, and surface runoff events do discharge to and traverse the Garrison property downstream, and eventually reach the West Fork Des Moines River and beyond" and BWT's "[t]ile systems can be more carefully designed to match soil and groundwater characteristics to accommodate better manure management." Robert Streit, a consulting agronomist, concluded "[b]ased on the application rates of manure in [2017 and 2018], the pounds of nitrogen exceeded the appropriate rate for the amount of nitrogen needed by the corn for optimum

yields for the crop year 2018." And Paul Kassel, an Iowa State University Extension Service agronomist, offered recommendations relying on the Corn Nitrogen Rate Calculator.

On May 4, the district court ruled that section 657.11(2) is not unconstitutional as applied to Garrison under the inalienable rights clause of the Iowa Constitution under *Gacke* because Garrison "received some benefit" from the statutory nuisance immunity. The court denied Garrison's motion to strike the defendants' affirmative defenses under sections 657.11(2) and 657.11A(5). The next day, Garrison filed a motion asking the court to reconsider and requested, in part, that the court address his takings challenge and "clarify that the 'as-applied' analysis only applies to damages other than for diminution in value to [his] property." The district court, without ruling on any takings claim, entered a ruling granting the defendants' motion for summary judgment on May 10, which Garrison appealed before the district court ruled on his motion to reconsider. He did not request a limited remand to allow the district court to rule on his motion to reconsider.

We retained the appeal. On appeal, Garrison argues the district court erred in finding sections 657.11(2) and 657.11A(5) are constitutional as applied, granting summary judgment, and finding section 657.11A(3) constitutional. The defendants argue Garrison failed to preserve error "on the issue of whether the application of Iowa Code section 657.11 constitutes a 'taking' with regard to his alleged diminution in property damages" and on his as-applied challenge to section 657.11A(3). The defendants further argue the district court correctly

found section 657.11 is constitutional as applied to Garrison, they are entitled to the statutory immunity protections of section 657.11, section 657.11A(3) is constitutional on its face, and the district court correctly granted summary judgment on the trespass and drainage claims. Alternatively, the defendants argue we should overrule *Gacke* and apply a rational basis test to find section 657.11 constitutional.

We allowed the Iowa Pork Producers Association and Iowa Farm Bureau Federation to file an amici curiae brief supporting the defendants' positions, including the request to overrule *Gacke.* The amici brief argues that "[i]n addition to a lack of evidence," Garrison's trespass "claim fails because he lacks the requisite exclusive possessory interest in the water flowing across his property, and because Iowa law contains the required manure land application rate calculations rather than a model constructed for inorganic commercial fertilizer."

**II. Standard of Review.**

"Constitutional claims are reviewed de novo." *City of Sioux City v. Jacobsma*, 862 N.W.2d 335, 339 (Iowa 2015). "We review rulings on statutory interpretation for correction of errors at law." *EMC Ins. Grp. v. Shepard*, 960 N.W.2d 661, 668 (Iowa 2021).

We also review rulings granting summary judgment for correction of errors at law. *Id.* "On motion for summary judgment, the court must: (1) view the facts in the light most favorable to the nonmoving party, and (2) consider on behalf of the nonmoving party every legitimate inference reasonably deduced from the record." *Morris v. Legends Fieldhouse Bar & Grill, LLC,* 958 N.W.2d 817, 821

(Iowa 2021) (quoting *Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689, 692 (Iowa 2009)). "Summary judgment is proper when the moving party has shown 'there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.' " *EMC Ins. Grp.*, 960 N.W.2d at 668 (quoting *MidWestOne Bank v. Heartland Co-op*, 941 N.W.2d 876, 882 (Iowa 2020)); *see also* Iowa R. Civ. P. 1.981(3).

**III. Analysis.**

We begin with an overview of Iowa's unique jurisprudence on the constitutionality of statutory nuisance immunity for farming operations. We next address whether Garrison preserved error on his challenge to Iowa Code section 657.11(2) under the takings clause in article I, section 18 of the Iowa Constitution, and we conclude he did not. We then analyze whether to retain *Gacke*'s three-part test under the inalienable rights clause in article I, section 1 of the Iowa Constitution. We overrule the test because it was wrongly decided, is difficult to administer, and has been superseded by subsequent decisions using the rational basis test. Applying rational basis review, we reject Garrison's inalienable rights challenge to sections 657.11(2) and 657.11A(5). Finally, we conclude the district court correctly entered summary judgement because Garrison lacked evidence to generate a jury question on any exception to the statutory immunity for his nuisance claim or causation for his trespass and drainage claims.

**A. Iowa's Unique Jurisprudence on the Constitutionality of Statutory Nuisance Immunity for Farming Operations.** This appeal represents a

recurring challenge to the constitutionality of the immunity provision in Iowa's

right-to-farm legislation, Iowa Code section 657.11(2), which provides:

> An animal feeding operation, as defined in section 459.102, shall not be found to be a public or private nuisance under this chapter or under principles of common law, and the animal feeding operation shall not be found to interfere with another person's comfortable use and enjoyment of the person's life or property under any other cause of action. However, this section shall not apply if the person bringing the action proves that an injury to the person or damage to the person's property is proximately caused by either of the following:
>
> > *a.* The failure to comply with a federal statute or regulation or a state statute or rule which applies to the animal feeding operation.
> >
> > *b.* Both of the following:
> >
> > (1) The animal feeding operation unreasonably and for substantial periods of time interferes with the person's comfortable use and enjoyment of the person's life or property.
> >
> > (2) The animal feeding operation failed to use existing prudent generally accepted management practices reasonable for the operation.[2]

The legislation codified the purpose of the immunity provision in the preceding

subsection: to promote agriculture by reducing nuisance litigation costs. *Id.*

§ 657.11(1).

---

[2]Additionally, Iowa Code section 657.11A(5) provides:

> This section shall not apply if the person bringing the action proves that the public or private nuisance or interference with another person's comfortable use and enjoyment of the person's life or property under any other cause of action is proximately caused by any of the following:
>
> > *a.* The failure to comply with a federal statute or regulation or a state statute or rule which applies to the animal feeding operation.
> >
> > *b.* The failure to use existing prudent generally utilized management practices reasonable for the animal feeding operation.

In 1998, we held a similar nuisance immunity statute enacted by the legislature for agricultural operations was in effect "an easement" imposed on property owners affected by the nuisance and thereby constituted a "taking" of their property in violation of article I, section 18 of the Iowa Constitution. *Bormann v. Bd. of Supervisors*, 584 N.W.2d 309, 316, 321 (Iowa 1998) (en banc) (striking down Iowa Code § 352.11(1)(*a*) (1995)). In 2004, in *Gacke*, we clarified *Bormann* to limit the recovery under a takings theory to the diminution in value of the affected property:

> In conclusion, we hold that *Bormann* and state takings jurisprudence requires us to invalidate the statutory immunity only insofar as it prevents property owners subjected to a nuisance from recovering damages for the diminution in value of their property. The Takings Clause does not prohibit the legislature from granting animal feeding operations immunity from liability for any other damages traditionally allowed under a nuisance theory of recovery.

*Gacke*, 684 N.W.2d at 175. Thus, affected neighbors could not rely on a takings theory to recover other noneconomic damages for nuisance, such as loss of enjoyment of the property. *Id.* But *Gacke* also found a different path to challenge the statutory immunity as unconstitutional as applied to the plaintiff under the inalienable rights clause in article I, section 1 of the Iowa Constitution. *Id.* at 175–79. The plaintiffs, who met a new three-part test created in *Gacke*, avoided the statutory nuisance defense in section 657.11(2). *Id.* at 178–79. In 2018, we reaffirmed the *Gacke* test in *Honomichl v. Valley View Swine, LLC*, stating:

> For courts to determine whether section 657.11(2) is unconstitutional as applied to plaintiffs, plaintiffs must show they (1) "receive[d] no particular benefit from the nuisance immunity granted to their neighbors other than that inuring to the public in general[,]" (2) "sustain[ed] significant hardship[,]" and (3) "resided on their property long before any animal operation was commenced" on

neighboring land and "had spent considerable sums of money in improvements to their property prior to construction of the defendant's facilities."

914 N.W.2d 223, 235–36 (Iowa 2018) (alterations in original) (quoting *Gacke*, 684 N.W.2d at 178). We made clear in *Honomichl* that "the *Gacke* factors require a fact-based analysis that generally requires a trial on the merits, or at least an evidentiary pretrial hearing." *Id.* at 238. Indeed, *Honomichl* reversed a summary judgment and remanded the case for an evidentiary hearing on the *Gacke* test before a trial on the merits on the nuisance claims. *Id.* at 238–39.

Neither *Gacke* nor *Honomichl* cited any authority for adopting the three-part test. No other court in any jurisdiction has adopted or used the test. The *Honomichl* majority rejected calls by the defendants and amici to overrule *Gacke. Id.* at 226, 236–37. Two justices in *Honomichl* concluded *Gacke* should be overruled. *Id.* at 239–40 (Waterman, J., concurring specially, joined by Mansfield, J.).

As *Honomichl* acknowledged, *Gacke* and *Bormann* stand alone. *Id.* at 233 (majority opinion). "All fifty states have right-to-farm laws that provide farmers with various forms of statutory immunity from nuisance claims similar to section 657.11(2)." *Id.* at 232. "Iowa is the only state to hold that the statutory immunity available under its right-to-farm law is unconstitutional in any manner." *Id.* at 233 & n.2 (collecting cases rejecting constitutional challenges); *see, e.g., Moon v. N. Idaho Farmers Ass'n*, 96 P.3d 637, 644–45 (Idaho 2004) (rejecting *Bormann*'s easement theory and declining "to hold that the nuisance immunity provision [in Idaho's right-to-farm law] creates an easement in favor of

the grass farmers" whose smoke from burning stubble drifted onto the plaintiff's land); *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1259 (Ind. Ct. App. 2009) ("[L]ike the Idaho and Texas courts, we have found nothing to suggest that Indiana has adopted the seemingly unique Iowa holding that the right to maintain a nuisance is an easement, and the Lindseys have failed to explain why we should."); *Labrayere v. Bohr Farms, LLC*, 458 S.W.3d 319, 327–34 (Mo. 2015) (en banc) (rejecting state constitutional challenges to Missouri's statutory immunity for agricultural operations); *Pure Air & Water Inc. of Chemung Cnty. v. Davidsen*, 668 N.Y.S.2d 248, 250 (App. Div. 1998) (rejecting due process challenge to New York's right-to-farm statute's immunity for private nuisance, noting that the plaintiffs lack "a vested interest in any rule of the common law"); *Barrera v. Hondo Creek Cattle Co.*, 132 S.W.3d 544, 547, 549 (Tex. App. 2004) (rejecting takings challenge to one-year statute of repose for nuisance claims against cattle feed lot).

After *Honomichl*, additional appellate decisions in other states have confirmed that Iowa remains an outlier. The South Dakota Supreme Court recently declined to follow our precedent in its decision rejecting constitutional challenges to a large-scale wind energy farm with 132 wind turbines spanning three counties. *Ehlebracht v. Crowned Ridge Wind II, LLC*, 972 N.W.2d 477, 481, 491–92 (S.D. 2022) ("But the decision in *Bormann* appears to be an outlier. We have never regarded the right to maintain a nuisance as an easement."); *see also Marsh v. Sandstone N., LLC*, 179 N.E.3d 402, 426–30 (Ill. App. Ct. 2020) (concluding the fee-shifting statute within right-to-farm legislation did not violate

the special legislation clause, equal protection clause, or separation of powers clause in the Illinois Constitution); *Himsel v. Himsel*, 122 N.E.3d 935, 945–49 (Ind. Ct. App. 2019) (holding an Indiana right-to-farm law did not constitute a taking or violate its open courts or privileges and immunities clauses); *Rural Empowerment Ass'n for Cmty. Help v. State*, 868 S.E.2d 645, 655 (N.C. Ct. App. 2021) (reviewing the constitutionality of amendments to North Carolina's right-to-farm statutes and holding that "[t]he Amendments are a valid exercise of legislative and the State's police powers, do not violate the Law of the Land Clause or Due Process, are not a special or private law, and do not deprive a prospective plaintiff of the right to a jury trial").[3]

Against this backdrop, we understand why litigants and amici curiae persist in calling for *Gacke* to be overruled. But as we explain next, *Gacke*'s takings holding clarifying *Bormann* is outside the scope of this appeal.

---

[3]As noted, the constitutional challenges to the nuisance immunities in right-to-farm statutes failed in every other court. The statutes in Indiana, North Carolina, and Texas included a one-year statute of repose after the CAFO begins operation, with nuisance claims allowed during that one-year time window. Ind. Code § 32–30–6–9(d) (2022); N.C. Gen. Stat. § 106–701 (2022); Tex. Agric. Code § 251.004(a) (2022). The Indiana, North Carolina, and Texas courts enforced the statutes of repose, but rejected the constitutional challenges without relying on the window of time allowed to sue in those states. *See Himsel*, 122 N.E.3d at 945–50; *Lindsey*, 898 N.E.2d at 1257–62; *Rural Empowerment Ass'n*, 868 S.E.2d at 652–55; *Barrera*, 132 S.W.3d at 549–50; *see also Marsh*, 179 N.W.3d at 423, 425–30 (holding attorney fee shifting statute is constitutional, which is part of Illinois's right-to-farm laws that also includes a one-year statute of repose). The appellate courts in the other four states adjudicating constitutional challenges upheld immunity provisions without any time window for nuisance claims; rather, the immunity was immediately available to qualifying farm operations. *See Moon*, 96 P.3d at 641–42, 646–49 (citing Idaho Code § 22–4803A(6) (2003)); *Labrayere*, 458 S.W.3d at 326, 327–34 (citing Mo. Rev. Stat. § 537.296 (2012)); *Pure Air & Water*, 668 N.Y.S.2d at 249–50 (citing N.Y. Agric. & Mkts. Law § 308(3) (McKinney 1996)); *Ehlebracht*, 972 N.W.2d at 487–92 (citing S.D. Codified Laws § 21–10–2 (2019)). Thus, the constitutionality of these immunity provisions does not turn on the availability of a window of time to bring a nuisance action after the CAFO begins operating. In any event, Garrison waited three years to file suit in federal court and four-and-a-half years to file in state court after the defendants' CAFO began—his lawsuits would have been time-barred under a one- or two-year statute of repose.

**B. Whether Garrison Preserved Error on a Takings Claim.** The defendants argue Garrison failed to preserve error on his takings claim. We agree. The district court never ruled on Garrison's takings claim before he appealed and deprived that court of jurisdiction. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). "When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal." *Id.* And the "moving party is deemed to have waived and abandoned a posttrial motion when that party files a notice of appeal." *Freer v. DAC, Inc.*, 929 N.W.2d 685, 687–88 (Iowa 2019). These basic principles compel the conclusion that Garrison failed to preserve his takings claim for appellate review.

Garrison alleged in his petition that the defendant's CAFO interfered with his "use and enjoyment of his property and result[ed] in the devaluation of his property." The defendants denied this allegation and alleged affirmative defenses. Garrison moved to strike the defendants' affirmative defenses, arguing "Iowa Code § 657.11(2) is unconstitutional as applied to the facts of this case pursuant to Article I, Section 1, of the Iowa Constitution" under *Gacke*. In his accompanying brief, Garrison quoted *Gacke*:

> [S]ection 657.11(2) violates article I, section 18 of the Iowa Constitution to the extent it deprives property owners of a remedy for the taking of their property resulting from a nuisance created by an animal feeding operation. In addition, we conclude section 657.11(2), as applied under the circumstances of this case,

> constitutes an unreasonable exercise of the state's police power and therefore violates article I, section 1 of the Iowa Constitution.

684 N.W.2d at 171. But Garrison went on to argue the inalienable rights clause—*not* the takings clause. When the defendants opposed his motion, Garrison's response asserted *Gacke*'s three-part test under the inalienable rights clause without even mentioning the takings clause.

The defendants moved for summary judgment arguing, in part, that they "are entitled to nuisance immunity under Iowa Code section 657.11." In Garrison's resistance to summary judgment, he again failed to raise any argument that section 657.11(2) is unconstitutional under the takings clause. The district court ruled that section 657.11(2) was constitutional as applied to Garrison under *Gacke*'s three-part inalienable rights clause test because he received a benefit from the statutory nuisance immunity. On that basis, the court denied Garrison's motion to strike the defendants' affirmative defenses under Iowa Code sections 657.11(2) and 657.11A(5). The court did not rule on any takings claim under article I, section 18.

Garrison filed a motion to reconsider that for the first time specifically asked the district court to rule on his takings claim.

> [T]he Court should clarify that the "as-applied" analysis only applies to damages other than for diminution in value to Mr. Garrison's property. The *Gacke* court reaffirmed the decision in *Bormann v. Bd. of Supervisors*, 584 N.W.2d 309 (Iowa 1998), that statutory immunity as to property damages violates the Takings Clause of the Iowa Constitution, and to the extent of property damages, there are no circumstances under which the immunity would be constitutional. As the *Gacke* court put it:
>
> > In conclusion, we hold that *Bormann* and state takings jurisprudence requires us to invalidate the statutory

> immunity only insofar as it prevents property owners subjected to a nuisance from recovering damages for the diminution in value of their property.
>
> So, the Defendants cannot rely on the immunity in §§ 657.11 and 657.11A with respect to Mr. Garrison's claim for diminution in value of his property. The Court should amend its Order to clarify this point.

A few days later, the court granted the defendants' motion for summary judgment without deciding or even mentioning Garrison's takings claim. The court reaffirmed its ruling that section 657.11(2) is constitutional as applied to Garrison under the inalienable rights clause and found the "Defendants are therefore entitled to judgment as a matter of law on the Plaintiff's claim that Defendants CAFO is a nuisance and interferes with Plaintiff's use and enjoyment of his property." Garrison promptly filed his notice of appeal without any district court ruling on his pending motion to reconsider the belatedly asserted his takings claim. His notice of appeal deprived the district court of jurisdiction to rule on that motion. *See Freer*, 929 N.W.2d at 688 (holding the plaintiff by filing her notice of appeal "waived and abandoned her posttrial motion").[4]

We conclude Garrison failed to preserve error on his takings claim, and for that reason we do not reach it.

**C. Whether to Overrule *Gacke*.** The district court ruled that Garrison benefited from section 657.11(2)'s statutory immunity when he operated his own CAFO and, therefore, could not show the statute was unconstitutional as applied to him under the first part of *Gacke*'s three-part test. Garrison argues the court

---

[4]Garrison also failed to file a motion in our court requesting a limited remand to allow the district court to rule on his motion to reconsider.

erred in ruling that he benefited from the statute without any lawsuit or claim against him to trigger its immunity protection. The defendants and amici argue the court correctly applied *Gacke* and, alternatively, argue we should overrule *Gacke* as outdated and wrongly decided.

We agree *Gacke*'s three-part test should be overruled. As noted above, *Gacke* is an outlier. This appeal once again illustrates how *Gacke*'s three-part test, which *Gacke* created out of whole cloth, engenders unnecessary litigation and is difficult to administer. *See Honomichl*, 914 N.W.2d at 239–40 (Waterman, J., concurring specially). *Gacke* was wrongly decided in that it failed to apply rational basis review to a challenge under article I, section 1 of our constitution to section 657.11(2). Our prior and subsequent decisions, as discussed below, have made clear that challenges under the inalienable rights clause to regulatory statutes must be adjudicated under the highly deferential rational basis test. Section 657.11(2) passes muster under that test.

*Gacke* itself recognized this statutory immunity falls within the police powers of the state:

> The legislature's objective of promoting animal agriculture in this state promotes the interests of the public generally and the immunity granted in this statute bears a reasonable relationship to this legislative objective. Therefore, even though individual producers are the direct beneficiaries of the statutory immunity, we think this provision is within the police power of the state.

684 N.W.2d at 178. Despite that acknowledgment, *Gacke* failed to apply traditional rational basis review. Instead of asking whether *the law* furthers a reasonable legislative objective, it asked whether *its application to the plaintiffs* in that particular case did—effectively the opposite of a rational basis test. *See*

*id.* at 178–79. *Gacke* thereby broke new ground by sustaining an as-applied constitutional challenge to section 657.11(2) under the inalienable rights clause. Article I, section 1 of the Iowa Constitution provides,

> All men and women are, by nature, free and equal, and have certain inalienable rights—among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness.

*Gacke* reiterated that "[t]he rights guaranteed by this provision are subject to reasonable regulation by the state in the exercise of its police power." 684 N.W.2d at 176. Yet *Gacke* nevertheless held that section 657.11(2) was unconstitutional as applied to the plaintiffs—only the second time in Iowa's history that a plaintiff succeeded in challenging legislation under the inalienable rights clause.[5]

In our view, the *Gacke* test is difficult to administer and requires unnecessary and duplicative litigation. By overruling *Gacke,* we eliminate the need to adjudicate its subsidiary issues, such as defining when neighboring claimants who raise livestock personally receive a "benefit" from section 657.11(2) under the first part of *Gacke*'s three-part test. *See* 684 N.W.2d at 178 (requiring proof the plaintiff "receive[d] no particular benefit from the nuisance immunity"). Is the plaintiff's own CAFO adjacent to the defendant's sufficient to establish a benefit? What about a plaintiff's CAFO at another location, such as Garrison's farmland in Kossuth and Wright counties where his tenants spread manure on his fields? Is a benefit shown when a neighbor

---

[5]Over a century ago, in *State v. Osborne,* our court relied on the both the due process clause and inalienable rights clause to strike down a statute imposing bond and licensing requirements on transient merchants. 154 N.W. 294, 297, 300–01 (Iowa 1915). Garrison has not raised a due process challenge to section 657.11(2).

refrained from suing the plaintiff because section 657.11(2) is on the books? Or is a lawsuit against the plaintiff required? Or a successful motion for summary judgment applying section 657.11(2)? *Gacke* left those questions unanswered presumably because the Gackes did not raise livestock. *See generally id.* at 178–79.

The second part of the *Gacke* test, that the plaintiff "sustain[ed] significant hardship," *id.* at 178, requires much the same evidence that would prove the CAFO is a nuisance as well as meet the statutory exception to immunity. *See* Iowa Code § 657.11(2)(*b*)(1) (conditioning an exception to immunity on proof the CAFO "unreasonably and for substantial periods of time interferes" with the plaintiff's use and enjoyment of property). And *Gacke*'s third part of the test, that the plaintiff resided on their property before the CAFO commenced, 684 N.W.2d at 178, involves the same evidence required to show the plaintiff did not come to the nuisance under common law, *see Freeman v. Grain Processing Corp.*, 895 N.W.2d 105, 120–21 (Iowa 2017) (discussing "priority of location" as a factor for determining the existence of a nuisance). Thus, the *Gacke* test requires two trials, at which the same evidence would be presented to decide functionally equivalent, overlapping issues. Indeed, *Honomichl* candidly acknowledged that the *Gacke* test leads to duplicative hearings: "While a district court may conduct a pretrial hearing for the specific purpose of determining the as-applied challenge, the plaintiffs can still rely on the exceptions to the immunity under sections 657.11(2)(*a*) and (*b*) if the district court finds the statute is not unconstitutional as applied." 914 N.W.2d at 238 (majority opinion). Overruling

*Gacke* will reduce the cost of CAFO litigation by eliminating this duplicative evidentiary hearing and avoiding unnecessary constitutional adjudication.

"We do not overturn our precedents lightly and will not do so absent a showing the prior decision was clearly erroneous." *McElroy v. State*, 703 N.W.2d 385, 394–95 (Iowa 2005) (collecting cases). "[S]tare decisis does not prevent the court from reconsidering, repairing, correcting or abandoning past judicial announcements when error is manifest . . . ." *Id.* at 395 (alteration in original) (quoting *Miller v. Westfield Ins.*, 606 N.W.2d 301, 306 (Iowa 2000) (en banc)). And "[s]tare decisis has limited application in constitutional matters." *Goodwin v. Iowa Dist. Ct.*, 936 N.W.2d 634, 649 (Iowa 2019) (McDonald, J., concurring specially) ("Thus, '[w]hen faced with a demonstrably erroneous precedent, my rule is simple: We should not follow it. This view of stare decisis follows directly from the Constitution's supremacy over other sources of law—including our own precedents.'" (alteration in original) (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1984 (2019) (Thomas, J., concurring))). As explained in the *Honomichl* special concurrence, we are convinced *Gacke* was clearly erroneous when decided and has been undermined by our later decisions applying the rational basis test. *Gacke*'s three-part test has not metastasized beyond chapter 657 and the test remains an outlier in Iowa jurisprudence, as well as nationally.[6]

---

[6]Several of our decisions discussed *Gacke* without reaffirming, expanding, or even applying its three-part test. In *Merrill v. Valley View Swine, LLC*, we unanimously affirmed the district court order under Iowa Code section 657.11(5) requiring the plaintiffs to pay the defendant CAFO operator's costs and expenses incurred defending frivolous claims after the plaintiffs voluntarily dismissed their nuisance claims. 941 N.W.2d 10, 12, 18–20 (Iowa 2020). In *Board of Water Works Trustees v. SAC County Board of Supervisors*, we declined to apply or extend *Gacke* to claims between public

After *Gacke,* we have correctly applied the rational basis test to adjudicate constitutional challenges to social and regulatory statutes under the inalienable rights clause. *See Planned Parenthood of the Heartland, Inc. v. Reynolds*, 962 N.W.2d 37, 46 (Iowa 2021) (applying rational basis review to a constitutional challenge under both the inalienable rights and equal protection clauses of the Iowa Constitution to legislation conditioning grant eligibility); *Gray v. Oliver*, 943 N.W.2d 617, 629–32 (Iowa 2020) (concluding a limitation on a successor-in-interest's ability to prosecute another's claim of legal malpractice did not violate the due process clause or the inalienable rights clause under rational basis review); *Clark v. Ins. Co. State of Pa.*, 927 N.W.2d 180, 190–91 (Iowa 2019) (applying rational basis review to reject an inalienable rights clause challenge to statutory immunity for insurance safety inspections); *Jacobsma*, 862 N.W.2d at 352–53 (applying rational basis review to a constitutional challenge to an automated traffic enforcement ordinance under the inalienable rights clause); *Midwest Check Cashing, Inc. v. Richey*, 728 N.W.2d 396, 403 (Iowa 2007) (rejecting inalienable rights clause challenge to payday loan statute and equating review to rational basis test, noting the statute "impacts a property right. But it is far removed from the type of legislation that is arbitrary and

---

entities over use of a public resource. 890 N.W.2d 50, 71–72 (Iowa 2017). In *Dalarna Farms v. Access Energy Coop.*, we held an electric utility's comparative fault defense would not reduce a potential "takings" award for a dairy farmer's diminution of value claim from stray voltage, but we also determined the farmer's inalienable rights claim was premature and declined to reach it. 792 N.W.2d 656, 658, 661–64 (Iowa 2010). None of the issues adjudicated in these three cases required a reaffirmation of *Gacke*'s three-part test and none involved a request to overrule it. These decisions remain good law.

unreasonable."); *see also Atwood v. Vilsack*, 725 N.W.2d 641, 651–52 (Iowa 2006) (rejecting a challenge to pretrial detention under the Sexually Violent Predator (SVP) Act, and stating, "Even if the right to bail in civil commitment proceedings pre-existed the Constitution and consequently falls within the ambit of the protections afforded by the unenumerated rights and inalienable rights clauses, the SVP statute is reasonable and, thus, constitutional."); Todd E. Pettys, *The Iowa State Constitution* 68 (2d ed. 2018) ("Because the standard of review under Section 1 is highly deferential to government actors, it is far easier to find cases in which Iowa courts have rejected inalienable-rights claims.").

We also note that before *Gacke*, we consistently applied a highly deferential review in rejecting inalienable rights clause challenges to legislation. *See, e.g.*, *Bennett v. Guthridge*, 225 N.W.2d 137, 139–40 (Iowa 1975) ("Regulations similar to the ordinance involved in this case [governing home construction standards] have long been upheld as valid exercises of the police power."); *Diamond Auto Sales, Inc. v. Erbe*, 105 N.W.2d 650, 651, 653 (Iowa 1960) (upholding a Sunday closing law for car dealers because it was "not an arbitrary and unreasonable regulation of plaintiffs' businesses"). *Gacke* is an aberration.

As we observed in *Jacobsma*, "[s]ome states with inalienable rights clauses similar to Iowa's have found them to be merely hortatory,"[7] while "[s]ome courts,

---

[7]*See, e.g.*, *Kunkel v. Walton*, 689 N.E.2d 1047, 1056–57 (Ill. 1997) (concluding that its inherent and inalienable rights clause does not provide judicially enforceable rights because it "is not generally considered, of itself, an operative constitutional limitation upon the exercise of governmental powers" (quoting George D. Braden & Rubin Goodman Cohn, *The Illinois Constitution: An Annotated and Comparative Analysis* 8 (1969))); *Morris v. Brandenburg*, 376 P.3d 836, 855 (N.M. 2016) ("[T]he Inherent Rights Clause has never been interpreted to be the

however, have held that inalienable rights clauses in state constitutions are judicially enforceable in a variety of contexts." 862 N.W.2d at 350; *see* Marshall J. Ray, *What Does the Natural Rights Clause Mean to New Mexico?*, 39 N.M. L. Rev. 375, 399–406 (2009) (reviewing the justifications for and against New Mexico's natural rights clause as a source of judicially enforceable substantive rights).

We concluded in *Jacobsma* that Iowa's inalienable rights clause must have "at least some constitutional bite." 862 N.W.2d at 351. We equated review under that clause to our rational basis test:

> Where liberty or property rights are allegedly infringed by a statute or ordinance, our inalienable rights cases have held that, even if the plaintiff's asserted interest is within the scope of the inalienable rights clause, the rights guaranteed by the provision are subject to reasonable regulation by the state in the exercise of its police power. This formulation, of course, is virtually identical to the rational-basis due process test or equal protection tests under the Federal Constitution.

*Id.* at 352 (citations omitted). We reached the same conclusion in *Gray*. 943 N.W.2d at 629–32 (reviewing constitutional challenges under the due process and inalienable rights clauses together under a rational basis review). And most notably, we recently applied rational basis review to reject an inalienable rights clause challenge to the statutory immunity for negligent inspections by workers' compensation insurers in Iowa Code section 517.5. *Clark*, 927 N.W.2d at 190–91.

---

exclusive source for a fundamental or important constitutional right, and on its own has always been subject to reasonable regulation.").

CAFOs are controversial, but it is not our role to second-guess the legislature's policy choices. *See AFSCME Iowa Council 61 v. State*, 928 N.W.2d 21, 26 (Iowa 2019) ("Our role is to decide whether constitutional lines were crossed, not to sit as a superlegislature rethinking policy choices of the elected branches."). Shortly after our constitution was ratified in 1857, our court concluded:

> The people, then, have vested *the* legislative authority, *inherent in them*, in the general assembly.
>
> . . . .
>
> Thus, it seems clear by logical deduction, and upon the most abundant authority, that this court has no authority to annul an act of the legislature unless it is found to be in clear, palpable and direct conflict with the written constitution.

*Stewart v. Bd. of Supervisors*, 30 Iowa 9, 18–19 (1870); *see also* Iowa Const. art. I, § 2 ("All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have the right, at all times, to alter or reform the same, whenever the public good may require it."); *Honomichl*, 914 N.W.2d at 240 (Waterman, J., concurring specially) ("The inalienable rights clause should be read together with the clause that immediately follows it in the Bill of Rights.").

We are to give our legislature the deference it is due under the Iowa Constitution. As we recently reiterated,

> [W]e must remember that statutes are cloaked with a presumption of constitutionality. The challenger bears a heavy burden, because it must prove the unconstitutionality beyond a reasonable doubt. Moreover, "the challenger must refute every reasonable basis upon which the statute could be found to be constitutional." Furthermore, if the statute is capable of being construed in more than one

manner, one of which is constitutional, we must adopt that construction.

*State v. Kilby*, 961 N.W.2d 374, 377 (Iowa 2021) (quoting *State v. Senn*, 882 N.W.2d 1, 6 (Iowa 2016)). *Gacke* erred by flouting our traditional deferential review of legislation affecting tort law and property rights.

As noted, in *Ehlebracht*, the South Dakota Supreme Court recently overruled constitutional challenges to a large wind energy farm. 972 N.W.2d at 487–92. The plaintiffs alleged that noise and light flicker from the wind turbines constituted a nuisance and that the government permits allowing the wind farm created an easement over their adjacent land. *Id.* at 484. The *Ehlebracht* court rejected their easement theory and described Iowa precedent, particularly *Bormann*, as an "outlier." *Id.* at 492.[8]

For all these reasons, we overrule *Gacke*'s three-part test under the inalienable rights clause and instead apply rational basis review. Specifically, we overrule part IV of *Gacke*,[9] as well as the decisions that followed and applied that test, including *Honomichl*, 914 N.W.2d 223 (majority opinion). [10]

---

[8]We caution that an expansive view of Iowa's inalienable rights clause, as advocated by our colleagues in the dissent, would jeopardize the development of wind energy in our state. The problems with the dissents are more fully addressed in Justice Mansfield's concurrence. The dissents primarily rely on takings jurisprudence, which leads to cognitive dissonance because Garrison failed to preserve his takings claim and *Gacke* itself disavowed a takings remedy for damages apart from the diminution in value. 684 N.W.2d at 175. The dissents also rely in part on the due process clause, but Garrison raised no due process challenge to section 657.11(2).

[9]Because Garrison failed to preserve error on his takings claim, we do not address part II and III of *Gacke*.

[10]The court of appeals, in an unpublished decision, affirmed a district court ruling applying *Gacke* in *McIlrath v. Prestage Farms of Iowa, L.L.C.*, No. 15–1599, 2016 WL 6902328, at *3 (Iowa Ct. App. Nov. 23, 2016). At the time, the court of appeals was bound to apply *Gacke*. In light of our holding today overruling *Gacke*, *McIlrath* is no longer good law.

**D. Application of the Rational Basis Test.** We now apply the proper rational basis test to resolve Garrison's constitutional challenge under the inalienable rights clause. To adjudicate claims under Iowa's inalienable rights clause, when no fundamental right or suspect class is at issue, we apply rational basis review to decide if there is a reasonable fit between the means used to advance the government interest and the interest itself. *McQuistion v. City of Clinton*, 872 N.W.2d 817, 833 (Iowa 2015).

Statutes are presumed constitutional, and we will not declare something unconstitutional under the rational basis test unless it "clearly, palpably, and without doubt infringe[s]" a constitutional right. *Residential & Agric. Advisory Comm., LLC v. Dyersville City Council*, 888 N.W.2d 24, 50 (Iowa 2016) (alteration in original) (quoting *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 8 (Iowa 2004)). The state "is not required or expected to produce evidence to justify its legislative action." *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 259 (Iowa 2007). A court needs only to find a "realistically conceivable" basis for the statute toward "a legitimate government interest." *Planned Parenthood of the Heartland*, 962 N.W.2d at 48 (quoting *AFSCME Iowa Council 61*, 928 N.W.2d at 32). And that basis need not be supported by evidence in the traditional sense:

> "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." A statute is presumed constitutional and "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it," whether or not the basis has a foundation in the record.

*Baker v. City of Iowa City*, 867 N.W.2d 44, 57 (Iowa 2015) (alterations in original) (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 319–21 (1993)).

Rational basis review, while not toothless, presents a "very deferential standard." *AFSCME Iowa Council 61*, 928 N.W.2d at 32 (quoting *NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 46 (Iowa 2012)). The party challenging the statute "must refute every reasonable basis upon which the statute could be found to be constitutional." *Hernandez-Lopez*, 639 N.W.2d at 233 (quoting *State v. Keene*, 629 N.W.2d 360, 364 (Iowa 2001)). Garrison cannot clear this high bar.

Protecting and promoting livestock production is a legitimate state interest, and granting partial immunity from nuisance suits is a proper means to that end. We accept at face value the legislature's statement of purpose for the immunity provision:

> The purpose of this section is to protect animal agricultural producers who manage their operations according to state and federal requirements from the costs of defending nuisance suits, which negatively impact upon Iowa's competitive economic position and discourage persons from entering into animal agricultural production. This section is intended to promote the expansion of animal agriculture in this state by protecting persons engaged in the care and feeding of animals. The general assembly has balanced all competing interests and declares its intent to protect and preserve animal agricultural production operations.

Iowa Code § 657.11(1).

Section 657.11(2) does not eliminate nuisance recovery rights altogether. Rather, neighboring property owners can recover for nuisance when the damage resulted from the CAFO's failure to comply with a federal or state statute or regulation, or when the CAFO "unreasonably and for substantial periods of time interferes" with the plaintiff's use of their property and the CAFO "failed to use existing prudent generally accepted management practices reasonable for the

operation." *Id.* § 657.11(2). And litigants may continue to seek recovery for diminution in property value under a takings theory. *See Gacke*, 684 N.W.2d at 174–75.

The Missouri Supreme Court under rational basis review upheld the constitutionality of that state's right-to-farm law limiting nuisance damages. *Labrayere*, 458 S.W.3d at 331–32. The *Labrayere* court recognized that promoting farming is a legitimate government interest and reducing nuisance liability is a proper means to that end:

> "It is within the province of the legislature to enact a statute which regulates the balance of competitive economic forces in the field of agricultural production and commerce, thereby protecting the welfare of its citizens comprising the traditional farming community, and such statute is rationally related to a legitimate state interest." Irrespective of the perceived desirability of section 537.296, the statute rationally advances the legitimate state interest in promoting the agricultural economy by reducing the litigation risk faced by Missouri farmers while permitting nearby landowners to recover the diminution in property value caused by agricultural operations.

*Id.* (citations omitted). We reach the same conclusion here. Indeed, the amici observe that liability risk has a chilling effect on the ability of new farmers to obtain financing. It is within the legislature's prerogative to lower the costs of litigation.

Balancing the competing interests of CAFO operators and their neighbors is a quintessentially legislative function involving policy choices our constitution places with the elected branches. *See Honomichl*, 914 N.W.2d at 240 (Waterman, J., concurring specially). "[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."

*Sanchez v. State*, 692 N.W.2d 812, 817 (Iowa 2005) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).

Common law rights existing in 1857 were not locked in place by the ratification of Iowa's inalienable rights clause. To the contrary,

> [T]he Supreme Court has stated that a litigant does not have a vested property right in any rule of the common law. "The Constitution does not forbid . . . the abolition of old [rights] recognized by the common law, to attain a permissible legislative object . . . ." Thus, if the legislature can abolish a cause of action for a legitimate purpose, it also may prevent a cause of action from arising by enacting a statute of repose.

*Bob McKiness Excavating & Grading, Inc. v. Morton Bldgs., Inc.*, 507 N.W.2d 405, 410 (Iowa 1993) (omissions and second alteration in original) (citations omitted) (quoting *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 88 n.32 (1978)). And the legislature is free to enact laws that affect how people use and enjoy their land. These laws can alter the common law. For example, in *Democko v. Iowa Department of Natural Resources*, we held the legislature could deprive landowners of the common law right to hunt on their property. 840 N.W.2d 281, 293 (Iowa 2013). We noted that "the nub of the issue is whether, under Iowa law, an Iowa landowner has a property right to hunt on his or her property. Regardless of what might have been at common law, we conclude the legislature has extinguished any such right." *Id.*; *see also Pure Air & Water*, 668 N.Y.S.2d at 249–50 (rejecting challenge to New York's right-to-farm statute that eliminated private nuisance claims because "a person does not have a vested interest in any rule of the common law"). The common law is not frozen and it

can be modified by the legislature so long as the legislation passes the rational basis test and does not amount to a taking without just compensation.

We have applied rational basis review to reject an inalienable rights clause challenge to the statutory immunity in Iowa Code section 517.5 for negligent inspections by workers' compensation insurers that led to an employee's injury. *Clark*, 927 N.W.2d at 190–91. We noted that "there has been no absolute elimination of a right of recovery for on-the-job injuries, but only a reasonable regulation of it." *Id.* at 191. Similarly, the legislature did not absolutely eliminate nuisance claims against CAFOs in section 657.11(2), but only imposed reasonable limitations on recovery rights.

We hold section 657.11 survives rational basis review. On that ground, we affirm the district court's denial of Garrison's motion to strike the defendants' affirmative defenses based on that statutory immunity.

**E. Whether the District Court Correctly Granted Summary Judgment.** "Summary judgment 'is not a dress rehearsal or practice run' for trial but rather 'the put up or shut up moment in a lawsuit, when a [nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Buboltz v. Birusingh*, 962 N.W.2d 747, 754–55 (Iowa 2021) (alteration in original) (quoting *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 808 (Iowa 2019)). The district court granted the defendants' motion for summary judgment dismissing Garrison's nuisance, trespass, and drainage claims. The court determined that Garrison lacked evidence to support any exception to the defendants' immunity from nuisance

liability in section 657.11(2). The court further determined that Garrison lacked evidence to prove causation for his remaining claims. Garrison largely relied on the same evidence for both his trespass and drainage claims, and we will address those claims together.

1. *Nuisance for loss of use and enjoyment.* The statutory immunity does not apply if "[t]he animal feeding operation unreasonably and for substantial periods of time interferes with the person's comfortable use and enjoyment of the person's life or property" and "[t]he animal feeding operation failed to use existing prudent generally accepted management practices reasonable for the operation." Iowa Code § 657.11(2)(*b*).[11] Garrison lacked evidence to establish an exception to the statutory immunity. *See id.*

Garrison contends the defendants should have planted more trees and extended the electrostatic fence around the entire confinement building. But the electrostatic fence was state-of-the-art and the defendants used fans to reduce the odor. Garrison's experts Streit and Kassel based their opinions on what would be appropriate for an optimum crop yield, not what is necessary for responsible manure management to avoid harm to neighboring land. Garrison lacked any evidence on generally accepted practices in the field of manure management for hog farms or animal feeding operations generally. The district

---

[11]As noted, the statutory immunity can be overcome if the plaintiff shows the defendants failed "to comply with a federal statute or regulation or a state statute or rule which applies to the animal feeding operation." Iowa Code § 657.11(2)(*a*). On appeal, Garrison does not argue this exception applies.

court summarized the record establishing Garrison's lack of evidence to generate a genuine issue of material fact:

> Plaintiff has no witnesses, expert or otherwise, to testify as to the prudence or general acceptance of any farm management practices. Plaintiff has no witnesses, expert or otherwise, to testify as to the prudence or general acceptance of the electrostatic fence. Plaintiff has no witnesses, expert or otherwise, to set a standard as to existing generally accepted management practices. In addition, Plaintiff has failed to identify any alternative technologies and approaches that would be considered "existing prudent generally accepted management practices." Plaintiff has identified no evidence that Defendants departed from any standard industry practices. Plaintiff therefore cannot meet his burden of proving that Defendants "failed to use existing prudent generally accepted management practices reasonable for the operation." Without such evidence, Plaintiff cannot claim the statutory exception under section 657.11(2)(b) as a matter of law.

We agree. The district court correctly ruled that Garrison lacked any evidence that the defendants failed "to use existing prudent generally accepted management practices reasonable for [their] operation." Iowa Code § 657.11(2)(*b*)(2). "Summary judgment is an important procedure in statutory immunity cases because a key purpose of the immunity is to avoid costly litigation, and that legislative goal is thwarted when claims subject to immunity proceed to trial." *Nelson v. Lindaman*, 867 N.W.2d 1, 7 (Iowa 2015). The defendants were entitled to summary judgment on nuisance as a matter of law.

2. *Trespass and drainage.* Garrison argues the defendants over-applied manure to BWT's field and caused excess nitrate to be discharged. The defendants moved for summary judgment arguing Garrison lacked evidence to prove their actions caused any damage. "On appeal, we consider the evidence

before the court at the summary judgment stage, not other or additional evidence that might have been introduced later in the case." *Buboltz*, 962 N.W.2d at 754.

"The gist of a claim for trespass on land is the wrongful interference with one's possessory rights in property." *Robert's River Rides, Inc. v. Steamboat Dev. Corp.*, 520 N.W.2d 294, 301 (Iowa 1994), *abrogated on other grounds by Barreca v. Nickolas*, 683 N.W.2d 111 (Iowa 2004). And for drainage, "[t]he general rule is that the dominant owner is entitled to drain surface water in a natural watercourse from his land over the servient owner's land and if any damage results the servient owner is without remedy." *O'Tool v. Hathaway*, 461 N.W.2d 161, 163 (Iowa 1990) (quoting *Rosendahl Levy v. Iowa State Highway Comm'n*, 171 N.W.2d 530, 536 (Iowa 1969)). The "corollary to the foregoing rule is 'an overriding requirement that one must exercise ordinary care in the use of his property so as not to injure the rights of neighboring landowners.' " *Id.* (quoting *Oak Leaf Country Club, Inc. v. Wilson*, 257 N.W.2d 739, 745 (Iowa 1977)). Thus, the dominant owner is liable "if (1) the manner or method of drainage is substantially changed and (2) actual damage results." *Id.*

The district court correctly granted summary judgment based on Garrison's lack of evidence on causation. "Generally questions of negligence, contributory negligence, and proximate cause are for the jury; it is only in exceptional cases that they may be decided as matters of law." Iowa R. App. P. 6.904(3)(*j*). The court determined that Garrison lacked evidence to prove causation:

> Plaintiff has yet to provide any analysis as to how the results of the water tests establish any violation on the part of Defendants. No expert has been disclosed give an opinion as to what the results of the water tests mean. Plaintiff has offered no expert evidence as to how any resulting inference can be correlated or attributed to Defendants. The water test results do not create a genuine issue of material fact on any issue. This is a subject that is beyond the ordinary intelligence of a layperson and must be supported by expert testimony . . . .

We agree. Garrison's failure to present expert testimony is fatal.

The defendants' properly supported motion for summary judgment required Garrison to "set forth specific facts showing that there is a genuine issue for trial." Iowa R. Civ. P. 1.981(5). He failed to do so. *See Buboltz*, 962 N.W.2d at 754–55 (noting summary judgment requires the nonmovant to "put up or shut up" (quoting *Slaughter*, 925 N.W.2d at 808)). Garrison lacked evidence showing the defendants' actions caused any recoverable damage to his property.[12] Without accompanying expert testimony, his water tests do not show an increase in nitrate levels nor a spike in nitrate levels that would correlate with manure spreading. And even assuming an increase in nitrate levels, Garrison lacked expert testimony to attribute or correlate any increase in nitrate levels in the stream to the defendants' actions.

We agree with the district court that "[w]ithout expert testimony tying Defendants' alleged misapplication or over-application of manure to the nitrate levels in the Plaintiff's stream, Plaintiff cannot, as a matter of law, meet his burden of proving that any trespass or drainage violation proximately caused

---

[12]Garrison did not argue in his resistance to the motion for summary judgment and does not argue on appeal that the 2018 consent order proves the defendant's conduct proximately caused harm to his property.

any damage to the Plaintiff." Further, the record contains no evidence showing Garrison's property was damaged by any increased drainage or by any excess nitrate in the water flowing through his property. The defendants were entitled to summary judgment on this record.[13]

**IV. Conclusion.**

For these reasons, we affirm the district court's summary judgment dismissing Garrison's action with prejudice.

**AFFIRMED.**

Christensen, C.J., and Mansfield and McDermott, JJ., join this opinion. Mansfield, J., files a concurring opinion, in which Waterman, J., joins. Appel, J., files a dissenting opinion, in which Oxley, J., joins. McDonald, J., files a dissenting opinion, in which Oxley, J., joins.

---

[13]Garrison met the same fate in federal court, where his claims against these defendants alleging ongoing violations of federal law were dismissed on summary judgment due to his lack of expert testimony to prove causation. *Garrison*, 449 F. Supp. 3d at 873–74. Given the differences between the applicable state and federal laws, we do not apply or rely on issue preclusion to affirm the Iowa district court judgment.

**MANSFIELD, Justice (concurring).**

I join the majority opinion. I write separately to respond to the dissents. It needs to be reiterated at the outset that Gordon Garrison did not preserve an argument against the statutory nuisance immunity under the *Bormann*-takings branch of our jurisprudence. His only timely argument was that the immunity should be set aside under the *Gacke*-inalienable-rights branch.

There is a crucial distinction between property and common law rules. The government can never take property without providing just compensation (and then only for a public use). However, the legislature is generally free to modify common law rules. *Gacke v. Pork Xtra, L.L.C.* undermined this important distinction by creating a sort of no-man's land between the two—a common law cause of action for noneconomic nuisance damages that wasn't property, but could only be regulated by the legislature subject to a newly minted three-part test. And to get to this result, *Gacke* deployed the very generally worded and aspirational inalienable-rights clause, a clause that could be invoked for practically any purpose by a court in search of previously undiscovered rights.

The dissents, if anything, undermine this important distinction between property and the common law even further.

### I. The Iowa Constitution Does Not Freeze the Common Law.

I begin by assuming that in 1857 there was a common law cause of action for noneconomic nuisance damages. However, the common law as it existed in 1857 does not have special constitutional status just because it is the common

law. "A fundamental assumption of Anglo-American law is that legislatures may alter common-law rules." Stephen A. Siegel, Lochner *Era Jurisprudence and the American Constitutional Tradition*, 70 N.C. L. Rev. 1, 65 n.339 (1991); *see id.* at 65 ("The common law traditionally was subject to legislative control."). "[T]here was broad agreement that Parliament had the ability to displace common law through statutes." Carissa Byrne Hessick, *The Myth of Common Law Crimes*, 105 Va. L. Rev. 965, 1009 n.212 (2019). "Where the common law and a statute differ, the common law gives place to the statute . . . ." 1 William Blackstone, *Commentaries* *89.

Consider what would happen if the Iowa Constitution froze the 1857 common law for all time. If so, we'd still have a cause of action for alienation of affections. Private employees would not be able to sue private employers for discrimination. Trade unions would be illegal restraints of trade. Comparative fault would not exist. The law could not require plaintiffs who recover punitive damages to turn over part of their recovery to the state. Simply put, it is the legislature's prerogative to pass laws that *change* the common law.

**II. *Gacke* Misapplied Article I, Section 1 to Restrict Legislative Authority to Modify the Common Law Even Though No Property Right Was Being Taken and the Legislation Met a Rational Basis Test.**

In *Bormann v. Board of Supervisors*, we held that an Iowa nuisance immunity law—which granted property owners immunity from nuisance suits under certain conditions—provided the benefited owners with "easements" over their neighbors' property and amounted to an unconstitutional "taking" of

property under article I, section 18 of the Iowa Constitution. 584 N.W.2d 309, 315–22 (Iowa 1998) (en banc).

However, in *Gacke*, 684 N.W.2d 168 (Iowa 2004), we qualified *Bormann*. We held that a nuisance immunity law resulted in a taking only to the extent that it prevented neighboring landowners from recovering diminution-in-value damages. *Id.* at 175. That is because paying diminution in value is the standard of compensation for taking an easement. *Id.* at 174–75. So, the initial lesson of *Gacke* is that any property right protected by article I, section 18 is limited to diminution-of-value damages. That's where constitutionally protected "property" ends. *See id.* at 175 ("Because the recovery of diminution-in-value damages fully compensates the burdened property owners for the unlawful taking of an easement, the restrictions of the Takings Clause end at that point. The Takings Clause does not prohibit limitations on other damages recoverable under a nuisance theory.")

But we didn't stop there. We said in *Gacke* that restrictions on suits for noneconomic damages may come into collision with article I, section 1 of the Iowa Constitution, even though they don't amount to a taking of property. *Id.* at 175–78. This, in my view, is where we went astray.

Article I, section 1 is essentially a paraphrase of some of the stirring language of our Declaration of Independence. It reads as follows:

> All men and women are, by nature, free and equal, and have certain inalienable rights—among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness.

Iowa Const. art. I, § 1.

Article I, section 1 needs to be read along with article I, section 2, which also paraphrases some of the stirring prose of the Declaration of Independence. Article I, section 2 reads as follows:

> All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have the right, at all times, to alter or reform the same, whenever the public good may require it.

*Id.* art. I, § 2.

Neither of these provisions can possibly be read literally. Do I have a right under section 1 to "obtain[] . . . happiness" from the State of Iowa? *Id.* art. I, § 1. If so, I'd like to sue for specific performance.

Nor can section 2 be read literally as allowing the people to march on our State Capitol and overthrow our government "whenever the public good may require it." *Id.* art. I, § 2.

Moreover, we already have language in article I, sections 9 and 18 expressly limiting the state's ability to interfere with life, liberty, and property. *See id.* art. I, §§ 9 ("[N]o person shall be deprived of life, liberty, or property, without due process of law."), 18 ("Private property shall not be taken for public use without just compensation first being made . . . ."). It would be illogical to conclude that the general and aspirational statement of rights in article I, section 1 could trump—or be used to alter the effect of—the more direct and specific language in article I, sections 9 and 18.

Unlike article I, section 1, the meat-and-potatoes provisions of our Bill of Rights have operational rather than just aspirational language. *See, e.g., id.* art. I, §§ 6 ("[T]he general assembly shall not grant . . . ."), 7 ("No law shall be passed

. . . ."), 8 ("The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated . . . ."), 9 ("[N]o person shall be deprived . . . ."), 10 ("In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right . . . ."), 18 ("Private property shall not be taken for public use . . . ."). Notably, once you get past article I, sections 1 and 2, all but one of the twenty-two enumerated rights contain the word "shall." *See id.* art. I, §§ 3–4, 6–19, 21–25.[14]

In plain recognition of these points, we've historically viewed article I, section 1 as simply incorporating a rational basis test. Or to be perhaps more precise, we have viewed article I, section 1 as not adding anything to the more specific constitutional guarantees elsewhere in the Iowa Bill of Rights.

Thus, in *Gacke* we reviewed prior caselaw under article I, section 1, which with one ninety-year-old exception had *never* sustained an article I, section 1 challenge. 684 N.W.2d at 175–77; *see State v. Osborne*, 154 N.W. 294 (Iowa 1915).[15] *Gacke* noted that under prior article I, section 1 caselaw, a "highly

---

[14]Article I, section 5 of the Iowa Constitution regarding dueling was repealed in 1992. It, too, included "shall." *See* Iowa Const. art. I, § 5.

[15]Justice Appel's dissent argues that *Coger v. Northwestern Union Packet Co.*, 37 Iowa 145 (1873), found article I, section 1 to be judicially enforceable. I think the situation is more complicated than his dissent lets on. *Coger* involved discrimination by a private entity—a common carrier—that refused to allow a person of color to travel in the first-class accommodations for which she had purchased a ticket. *Id.* at 147–48. Our court upheld the jury verdict in her favor, citing several sources of authority. *Id.* at 153–60. One was undoubtedly the "principle of equality" set forth in article I, section 1. *Id.* at 153. But we went on to cite other authority, including perhaps most importantly the Federal Civil Rights Act of 1866, which gave all persons regardless of race and color "the same right in every State and Territory in the United States, to make and enforce contracts." *Id.* at 156.

deferential standard of review" applied and the legislature could pass laws so long as they were not "unduly oppressive." *Id.* at 177 (quoting *Gravert v. Nebergall*, 539 N.W.2d 184, 186 (Iowa 1995)). Essentially, pre-*Gacke*, we had applied rational basis review under article I, section 1. *See, e.g., Gravert*, 539 N.W.2d at 186 ("Laws enacted by the exercise of a state's police power are presumed to be constitutional provided there is some reasonable relation to the public welfare, and one challenging the validity of such laws can rebut this presumption only by negating every reasonable basis upon which the laws may be sustained."); *Gibb v. Hansen*, 286 N.W.2d 180, 186 (Iowa 1979) ("[L]iberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community." (quoting *Benschoter v. Hakes*, 8 N.W.2d 481, 486 (Iowa 1943))); *Steinberg–Baum & Co. v. Countryman*, 77 N.W.2d 15, 20 (Iowa 1956) ("That a law may be severe, drastic or work hardship does not render it unconstitutional in the respect claimed."). And, as the majority persuasively demonstrates, post-*Gacke* we have applied rational basis review.

Yet we did *not* apply rational basis review in *Gacke*. Instead, we decided that the nuisance immunity for noneconomic damages would be "unduly oppressive" and a violation of article I, section 1 when three conditions were met. *Gacke*, 684 N.W.2d at 178. First, the neighboring landowner "receive[s] no particular benefit from the nuisance immunity granted to their neighbors other than that inuring to the public in general." *Id.* Second, the neighboring landowner "sustain[s] significant hardship." *Id.* And third, the neighboring

landowner "resided on their property long before any animal operation was commenced." *Id.*

This three-part test is something that a philosopher king might devise. And if I were the philosopher king of Iowa, I might agree that we should subject nuisance immunities for animal feeding operations to this three-part test. But this test bears no resemblance to rational basis review. Under rational basis review, a law is sustained if it is rationally related to a legitimate state interest. *E.g., State v. Doe*, 927 N.W.2d 656, 662–63 (Iowa 2019). No one can dispute that the promotion of animal agriculture is a legitimate state interest and that immunizing animal feeding operations from litigation if they meet certain benchmarks is rationally related to that end. Iowa Code section 657.11 (2020) satisfies a rational basis test.

To sum up, *Gacke*'s inalienable-rights analysis came out of nowhere and has no limiting principle. Both dissents therefore try to defend *Gacke* largely by repackaging *Gacke* as something it wasn't.

### III. Justice Appel's Dissent Tries to Save *Gacke* by Finding Precedent Where It Isn't and Property Where It Isn't.

Justice Appel defends the *Gacke* test on the ground that there needs to be *some* test whenever there is an open-ended constitutional provision. But that's not necessarily true. If the provision is in the form of a command—e.g., "no person shall be deprived of life, liberty, or property, without due process of law"—then clearly there needs to be a test to implement that command. Iowa Const. art. I, sec. 9. But if the provision is a general statement of principles like article I, section 1, then why does there have to be a test at all? If there is going to be a

test, it should not be more restrictive than the test that would otherwise be applied under other, more specific constitutional provisions.

Even the considerable scholarly talents of Justice Appel cannot uncover a plausible precedent for *Gacke*. Justice Appel says the three-part test "seems to have originated" in *Lawton v. Steele*, 152 U.S. 133 (1894). I doubt it. The *Lawton* opinion uses the phrase "unduly oppressive" but there is no three-part test. *Id.* at 137. The case involved government seizure and destruction of certain nets used for illegal fishing. *Id.* at 139. The United States Supreme Court upheld the government's actions. *Id.* at 143.

Under *Gacke*, a person can get a law declared unconstitutional that wouldn't otherwise be unconstitutional because they received "no particular benefit . . . other than that inuring to the public in general." 684 N.W.2d at 178. If we took the *Gacke* test and started applying it across the board, this would dramatically shift power from the legislative to the judicial branch. Everyone can find some law or regulation that works a hardship on them while providing "no particular benefit" to them.

Justice Appel also errs when he asserts that this case presents the following question: "Can the government, consistent with article I, section 1 of the Iowa Constitution, enact a statute that authorizes a landowner to appropriate or take for the landowner's benefit the property interest of a neighboring landowner, without any compensation or benefit to the other owner?" Property rights are not at issue in this case because no one is challenging a property owner's ability to recover diminution-of-value damages in a case wherein a

takings claim is preserved. This case involves only a common law right that was afforded special constitutional protection in *Gacke*.

**IV. Justice McDonald's Dissent Tries to Save *Gacke* by Altering What *Gacke* Actually Held.**

Justice McDonald's dissent is more difficult to pin down. At the beginning and at the end of his dissent, Justice McDonald gives prominence to the text of article I, section 1, as if to indicate that the section has some independent legal force. But in between he acknowledges that article I, section 1 only imposes a rational basis test—the same test that we would apply to legislation like Iowa Code section 657.11 even if there were no article I, section 1.

However, Justice McDonald then says that section 657.11 fails a rational basis test. Why? Because it takes away property. Except we said otherwise in *Gacke*. We held it did not amount to a taking when the legislature limited the right to sue for noneconomic damages. *See Gacke*, 684 N.W.2d at 175 ("The Takings Clause does not prohibit limitations on other damages recoverable under a nuisance theory.").

As *Gacke* recognized, not every "stick" in the property owner's traditional "bundle" is beyond the power of the government to regulate. For example, one of the classic sticks associated with property ownership is the right to build on property. Yet, for the greater good of the community, the government can limit what property owners build on their property, and we subject those building codes and zoning laws to a rational basis test. *See, e.g., Residential & Agric. Advisory Comm., LLC v. Dyersville City Council*, 888 N.W.2d 24, 49 (Iowa 2016) ("Zoning and land use ordinances that do not impact a suspect classification

must only meet the rational relationship test."). So too the government can regulate nuisance claims brought by one property owner against another, so long as the government is not actually taking away property or acting arbitrarily and irrationally.

As I've already noted, there is a crucial distinction between *property itself,* which the government cannot take without compensation, and *common law rules*, which the government can generally modify. Justice McDonald erodes that distinction entirely, and would go well beyond *Gacke.* He would replace *Gacke*'s three-part test with a blanket rule that any limit on recovery of noneconomic damages for nuisance is *per se* unconstitutional. That doesn't sound anything like a rational basis test, and it isn't.

Another giveaway that Justice McDonald is not applying a rational basis test is his assertion that "[t]he damage, degradation, and destruction caused by industrial animal feeding operations [are] well-documented." This sounds like the dissent is expressing its views on a policy matter rather than applying the rational basis test. Our state is one of the nation's leading food producers. *See* Iowa Const. art. IX, 2nd, § 3 ("The general assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement."). There is a tradeoff between food production and environmental protection. Maximizing food production can adversely impact the environment. Maximizing environmental protection can increase the costs of producing food and thus increase food prices. Not everyone can afford to buy a steak—or even a hamburger.

The legislature has chosen to balance the two goals of promoting agriculture and protecting the environment by providing that the legislative nuisance immunity

> shall not apply if the person bringing the action proves that an injury to the person or damage to the person's property is proximately caused by either of the following:
>
> *a.* The failure to comply with a federal statute or regulation or a state statute or rule which applies to the animal feeding operation.
>
> *b.* Both of the following:
>
> (1) The animal feeding operation unreasonably and for substantial periods of time interferes with the person's comfortable use and enjoyment of the person's life or property.
>
> (2) The animal feeding operation failed to use existing prudent generally accepted management practices reasonable for the operation.

Iowa Code § 657.11(2). In other words, the plaintiff has to prove either noncompliance with a rule or statute or a failure to use generally accepted practices resulting in an unreasonable interference for substantial periods of time. This is the kind of policy tradeoff the legislature gets to make unless the government is actually taking property, which under *Gacke* it isn't.[16]

Whatever one may think of Iowa Code section 657.11, it is not being described accurately by Justice McDonald's dissent. Justice McDonald asserts,

---

[16]Some time ago, our court said,

> It was most effectively demonstrated during the depression of the early nineteen thirties that the well-being of the state as a whole is directly dependent upon the welfare of agriculture. The prosperity of our basic industry was no less vital when this act was passed nor is it less vital now when many other countries look to us for food and agriculture must supply their needs.

*Dickinson v. Porter*, 35 N.W.2d 66, 76 (Iowa 1948).

"The Iowa statute wholly deprives a property owner of the right to assert a private nuisance action and seek full compensation." That is not correct. The Iowa statute has exceptions, as just noted.

Near the end of his dissent, Justice McDonald quotes an earlier dissenter on our court, who said, "[T]he end of police power is reached when the rights of others have been protected, and when rights are cut down in order that others may profit thereby, the limit of police power has been exceeded . . . ." *Des Moines Joint Stock Land Bank of Des Moines v. Nordholm*, 253 N.W. 701, 727–28 (Iowa 1934) (Claussen, C.J., dissenting). But like the text of article I, section 1 itself, this quotation doesn't help you decide a specific case. It begs the question of what the "right" is, and whether it is subject to reasonable regulation.

A final point worth noting is that the two dissents don't agree on what to do about *Gacke*. Justice Appel would keep the three-part test; Justice McDonald would go beyond *Gacke* and get rid of the three-part test altogether.

In summary, both dissents try to shore up *Gacke*, but they both end up at sea. *Gacke* should be overruled.

Waterman, J., joins this concurrence.

#21–0652, *Garrison v. New Fashion Park LLP*

**APPEL, Justice (dissenting).**

The first article in the Iowa Constitution is the Iowa Bill of Rights, and the first section of the first article is what has been called the inalienable rights or the natural rights clause. Iowa Const. art. I, § 1 ("All men and women are, by nature, free and equal, and have certain inalienable rights—among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness."). The positioning of the Iowa Bill of Rights in the very first article of the Iowa Constitution was not happenstance—it was deliberate. *Hoover v. Iowa State Highway Comm'n*, 222 N.W. 438, 439 (Iowa 1928) ("Appearing . . . at the very threshold of the Iowa Bill of Rights, [article I, section 1's] constitutional safeguard is thereby emphasized and shown to be paramount."); *see State v. Baldon*, 829 N.W.2d 785, 809–10 (Iowa 2013) (Appel, J., specially concurring) (noting the priority placement of the Iowa Bill of Rights shows that the Iowa Constitution "emphasizes rights over mechanics" (quoting Donald P. Racheter, *The Iowa Constitution: Right over Mechanics*, *in The Constitutionalism of American States* 479, 479 (George E. Connor & Christopher W. Hammons eds., 2008))). And the placement of the inalienable rights or natural rights clause as the first section of the first article was also intentional. *See* Bruce Kempkes, *The Natural Rights Clause of the Iowa Constitution: When the Law Sits Too Tight*, 42 Drake L. Rev. 593, 631 (1993) (noting the drafter's placement of the clause at the very beginning of the constitution strongly supports the argument that article I,

section 1 should be given "substantive meaning"). The Committee on the Bill of Rights at the Iowa Constitutional Convention of 1857 desired to have "the best and most clearly defined Bill of Rights." 1 *The Debates of the Constitutional Convention of the State of Iowa* 100 (W. Blair Lord rep., 1857), http://publications.iowa.gov/7313/1/The_Debates_of_the_Constitutional_Convention_Vol%231.pdf [hereinafter *The Debates*]. The Committee aimed "to make the Bill of Rights as full and perfect as possible." *Id.* at 102. The goal, the committee declared, "is to protect every man in the enjoyment of the largest liberty consistent with his duties to civil government." *Id.*; *see also State v. Tucker*, 959 N.W.2d 140, 158–59 (Iowa 2021) (Appel, J., concurring specially) (discussing the history and importance of article I, section 1 of the Iowa Constitution). We must never forget that the Iowa founders presented a rights-based constitution to the voters of Iowa. And the rights provided by the Iowa Constitution are superior and above the vicissitudes of politics.

The very purpose of a bill of rights and the inalienable rights clause is to ensure that individual liberties are not subject to erosion by an aggressive legislative or executive branch. George W. Ells, the chair of the committee drafting Iowa's Bill of Rights, insisted that the safeguard of the Iowa Bill of Rights was fundamental, and it was intended "to place the proper restrictions upon the powers of the Legislature." *The Debates*, at 168. The founders were well aware of the capability of special interests to dominate the halls of government. That is why, for example, the Iowa founders put sharp restrictions on the passing out of privileges and immunities, limits on advancing the credit of the state

government, and prohibitions on the state paying the debt of corporations. *See* Iowa Const. art. I, § 6; *id.* art. VII, § 1; *id.* art. VIII, § 3. Otherwise, special interests could dominate the political branches for their own benefit and not the public interest. In other words, it sets to establish that the inalienable rights of Iowans simply cannot be trampled upon by majority action.

Nothing in section 2 of the Iowa Bill of Rights undercuts the rights established in the inalienable rights clause. Section 2 states that political power is vested in the people of Iowa. Clearly, the people of Iowa are not the same as the people in the legislature. The people of Iowa are the citizens or, more precisely, the voters. And, unlike ordinary legislative enactments, the provisions of the Iowa Bill of Rights have been approved by the people. When the court enforces the terms of the Iowa Bill of Rights, the court is not subverting the will of the people but actually enforcing it. *See* Timothy Sandefur, *The Conscience of the Constitution: The Declaration of Independence and the Right to Liberty* 120–22 (2014) (noting that the current trend prioritizing democracy over liberty and encouraging courts to defer to lawmakers is a misunderstanding of the Federal Constitution and its principles). The Iowa Bill of Rights is a shield that protects the people's rights from the political process. *Id.* at 94–119 (establishing that courts have a duty to protect the individual rights against the majoritarian action of the legislature and that to enforce the constitutional guarantees for individual rights, governments should not have the unbounded power to act in the name of public good). The Iowa Bill of Rights cannot be stood on its head and made into a facilitator of legislative domination when its purpose was precisely the opposite.

Plainly, article I, section 1 was designed to be enforced by the judiciary. *Hoover*, 222 N.W. at 439 ("These provisions for the security of the rights of the citizen stand in the Constitution in the same connection and upon the same ground as they regard his liberty and his property. It cannot be denied that both were intended to be enforced by the judiciary as one of the departments of the government established by that Constitution." (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882))).

In a parliamentary form of government, the legislature can both enact ordinary legislation and determine what is constitutional and what is not. That, of course, is the system rejected in the American Revolution. And the parliamentary system with legislative dominance was firmly rejected when the Iowa constitutional convention proposed—and the citizens of Iowa approved— the Iowa Bill of Rights.

I now consider the central issue in this case: Can the government, consistent with article I, section 1 of the Iowa Constitution, enact a statute that authorizes a landowner to appropriate or take for the landowner's benefit the property interest of a neighboring landowner, without any compensation or benefit to the other owner? Or, put more simply, can a statute permit a private entity to take property from other people without any benefit to the property owner? Or, more particularly, can the legislature give a ticket to a large business to come to a rural neighborhood, build a huge animal confinement facility that creates a common law nuisance through fetid odor, without risk of being sued for damages by long-time residential property owners whose right to enjoyment

of their property has been impaired or destroyed? Or, more rhetorically, can we chalk up the nuisance harms in this case that impair the enjoyment of neighboring property as a legislatively required contribution to the private good of the owners of the hog facility? In other words, are we telling the existing property owners that they are required to "take one for the team" as the private owners next door emit nuisance odors under a scheme of statutory immunity?

I now turn to the contents of article I, section 1 of the Iowa Constitution, which provides: "All men and women are, by nature, free and equal, and have certain inalienable rights—among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness." The provision opens by declaring that all men and women are, "by nature," free and equal. *Id.* And it references "inalienable" rights, which government cannot take away, "among which" are those of "acquiring, possessing and protecting property." *Id.*

Notably, a provision of this kind is completely absent from the United States Constitution. Some might argue that the inalienable rights clause, reminiscent of the Virginia Bill of Rights and its derivative Declaration of Independence, is not part of the law. *See* Va. Const. art. I, § 1. According to Justice Scalia, the concepts in a declaration of rights provision "is not a legal prescription conferring powers upon the courts." *Troxel v. Granville*, 530 U.S. 57, 91–92 (2000) (Scalia, J., dissenting) (acknowledging, however, that in his view, a right of parents to direct the upbringing of their children is among the "unalienable Rights" referred to in the Declaration of Independence, as well as

being one of the "othe[r] [rights] retained by the people" under the Ninth Amendment to the United States Constitution (alterations in original) (first quoting The Declaration of Independence para. 2 (U.S. 1776); then quoting U.S. Const. amend. IX)).

But article I, section 1 of the Iowa Constitution *is* a legal prescription conferring powers upon the courts. We said so early on in *Coger v. North Western Union Packet Co.*, where the equality provision in article I, section 1 was cited: "This principle of equality is announced and secured by the very first words of our State constitution which relate to the rights of the people, in language most comprehensive, and incapable of misconstruction, namely: 'All men are, by nature, free and equal.' " 37 Iowa 149, 154–55 (1873) (quoting Iowa Const. art. I, § 1). Relying on article I, section 1 of the Iowa Constitution, the *Coger* court declared, "The doctrines of natural law . . . forbid that rights be denied on the ground of race or color; and this principle has become incorporated into the paramount law of the Union." *Id.* at 154. "Upon it we rest our conclusion in this case." *Id.* at 155. Any attempt to render article I, section 1 of the Iowa Constitution meaningless is inconsistent with the forceful holding in *Coger*.

Decided twenty-three years before the tragic United States Supreme Court case of *Plessy v. Ferguson,* 163 U.S. 537 (1896), *overruled by Brown v. Board of Education,* 347 U.S. 483 (1954), *Coger* is a great and heroic case, one that belongs in the pantheon of Iowa judicial accomplishments. So, the equal rights provision of article I, section 1 is a strong and judicially enforceable provision, a lesson that should not be lost on the current generation of lawyers and judges.

If the equality provision of article I, section 1 is strong and judicially enforceable, why wouldn't its protections of life and property of individuals be strong and judicially enforceable?

In *Gacke v. Pork Xtra, L.L.C.,* we considered the application of article I, section 1 in a context similar to that presented by this case. *See* 684 N.W.2d 168, 175–77 (Iowa 2004). In that case, residential property owners brought a nuisance action against the operator of a hog confinement facility. *Id.* at 171. Under section 657.11(2), the hog confinement operator was granted immunity from nuisance actions. *Id.* at 171–73. While the statute generally barred nuisance actions, exceptions to immunity were made when (1) the animal feeding operation interfered "unreasonably and for substantial periods of time" with the "comfortable use and enjoyment" of the person's life or property, and (2) "the animal feeding operation failed to use existing prudent generally accepted management practices reasonable for the operation." *Id.* at 173 (quoting Iowa Code § 657.11(2)(*b*) (1999)).

On the nuisance question, we noted that under prior caselaw, article I, section 1 was designed "to secure common law rights pre-dating the constitution." *Id.* at 176. In determining the issue, we focused on three questions: The first question, the existence of preexisting common law rights, we found that property rights included "the rights of use and enjoyment." *Id.* at 177 (quoting *Liddick v. City of Council Bluffs*, 5 N.W.2d 361, 374 (Iowa 1942)). The second question, whether the nuisance immunity statute was within the police power of the state, we concluded that it was. *Id.* We then turned to the third

question, whether the statute was a reasonable exercise of police power. *Id.* at 178–79. In considering whether the statute was a reasonable exercise of police power, we cited two traditional Iowa cases for the proposition that restrictions that are unduly oppressive may be invalid: *Steinberg–Baum & Co. v. Countryman,* 77 N.W.2d 15, 19 (Iowa 1956) (holding that "restrictions that are prohibitive, oppressive or highly injurious . . . are invalid"), and *State v. Osborne,* 154 N.W. 294, 300 (Iowa 1915) (holding article I, section 1 includes the right to pursue useful and harmless business "*without the imposition of oppressive burdens* by the lawmaking power*" (emphasis added)). *Gacke,* 684 N.W.2d at 177. Our precedent, of course, is not limited to only two cases. In *Gravert v. Nebergall,* we emphasized that for the legislature to exercise the state's police power, the means chosen must not be "unduly oppressive upon individuals." 539 N.W.2d 184, 186 (Iowa 1995) (quoting *Lawton v. Steele,* 152 U.S. 133, 136–37 (1894)). In short, the three-part *Gacke* test was not an outlier in Iowa law but represented a conventional test for judicial review of property rights issues.

In considering whether the legislation was unduly oppressive under the third part of the inalienable rights test we applied in *Gacke,* we identified three facts that showed it was oppressive to the Gackes: they received no particular benefit from the immunity provision other than that inuring to the public in general, they spent considerable sums to improve their property prior to construction of the facility, and they resided on their property long before the animal operation was commenced. 684 N.W.2d at 178; *see also Honomichl v. Valley View Swine, LLC,* 914 N.W.2d 223, 234–35 (Iowa 2018) (explaining that

"[o]ur holding that section 657.11(2) was unconstitutional under the inalienable rights clause as applied in *Gacke* was primarily based on three facts present in that case" and identifying three things a plaintiff needed to show under *Gacke*). The consideration of these facts in determining whether a regulation is oppressive was a sound, reasonable approach.

Now the majority asserts that there is no textual support in article I, section 1 of the Iowa Constitution for the three factors utilized in *Gacke*. But this is a meaningless observation. When a court develops legal doctrine under an open-textured constitutional provision such as this, there is never express textual support. If there is textual support, there is no need to develop doctrine. While the majority notes that there is no text in article I, section 1 embracing the *Gacke* test, there is equally no text embracing the federal rational basis test dragooned into service by the majority. So, the majority's "no textual support" argument proves too much—if it is correct, then the rational basis test is invalid, too.

That the majority does not like the court's consideration of the three factors in *Gacke* does not mean it can simply eliminate the unduly-oppressive part from the three-part inalienable rights test we used in that case. The majority concludes that the consideration of the three factors is unworkable, but then proceeds to remove the unduly oppressive element from the overall test. The three-part inalienable rights test enunciated in *Gacke* is a traditional test that has been cited many times, not only in Iowa but in the caselaw generally. The test seems to have originated in the United States Supreme Court case of *Lawton*

*v. Steele*, 152 U.S. at 136–37, and was applied by multiple courts in the early twentieth century. *See, e.g.*, *Mack v. Westbrook*, 98 S.E. 339, 341–42 (Ga. 1919); *In re Boyce*, 75 P. 1, 6 (Nev. 1904); *Frank L. Fisher Co. v. Woods*, 79 N.E. 836, 837–38 (N.Y. 1907); *Froelich v. City of Cleveland*, 124 N.E. 212, 216 (Ohio 1919).

With the coming of the New Deal and the new approach to government regulation adopted by the United States Supreme Court in cases like *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483 (1955), some courts may have been tempted to fall in line with changing federal law. An example is *Yim v. City of Seattle*, where the Supreme Court of Washington eliminated the "unduly oppressive" test from its takings law and substantive due process law, citing evolving Supreme Court precedent. 451 P.3d 694, 699–702 (Wash. 2019). In the State of Washington, for years, courts applied a test when reviewing economic regulation that included an "unduly oppressive" formulation like *Gacke*. *Id.* at 698–701 (discussing the *Lawton* "unduly oppressive" test, noticing it is more demanding than the ordinary rational basis review).

But there are cases heading in the opposite direction as well. In *Patel v. Texas Department of Licensing & Regulation*, the Supreme Court of Texas concluded that under the "due course of law" provision of the Texas Constitution, the cosmetology licensing applied to eyebrow threaders was overly "oppressive." 469 S.W.3d 69, 87–90 (Tex. 2015); *see* Tex. Const. art. I, § 19 (due course of law provision). In *Ladd v. Real Estate Commission*, the Supreme Court of Pennsylvania likewise held that the commonwealth's police power must not be

conducted in a manner that is "unduly oppressive" 230 A.3d 1096, 1106, 1111–15 (Pa. 2020).

The majority asserts that we departed from the traditional approach of *Gacke* in *City of Sioux City v. Jacobsma,* 862 N.W.2d 335, 352 (Iowa 2015). The majority suggests that in *Jacobsma,* we held that the rational basis test should be applied to article I, section 1 claims. Well, not exactly. In fact, in *Jacobsma,* "we ha[d] not been asked to develop a substantive standard under the Iowa due process clause different than the applicable federal standard." *Id.* at 347. Similarly, although we noted that there was controversy on the standard to apply to claims under article I, section 1 of the Iowa Constitution, we observed in *Jacobsma* that the only argument advanced by the plaintiff was that the ordinance being challenged was "not a reasonable regulation and is an arbitrary restraint." *Id.* at 352. We did not "hold" anything as a result of a contested adversary proceeding, but simply accepted the parties' framing of the issue for purposes of that case. And the context in *Jacobsma,* of course, involving a traffic ticket for an infraction, is completely different than the transfer of an interest in property from one owner to another. *Id.* at 337. As a result, *Jacobsma* featured limited advocacy of the parties, the subsequent limitation of the issues by this court, and a complete lack of adversarial presentation on the key issue of standard of review of article I, section 1 claims. This nonprecedent is a slender reed and cannot be used as a lever to overturn the results of the thoroughly litigated and highly adversarial processes in *Gacke* and *Honomichl v. Valley View Swine L.L.C.*

There is talk in the majority of stare decisis. *Gacke* has been around, however, for almost twenty years and was reaffirmed in 2018 in *Honomichl. See* 914 N.W.2d at 236–39. The *Honomichl* case noted that there had been some changes in the legal landscape since *Gacke,* including legislative amendments to the statute requiring a manure management plan and a requirement that the Iowa Department of Natural Resources adopt standards related to an application for construction or expansion of an animal facility. *Id.* at 237. Yet, in *Honomichl,* we stated that the analytical framework of *Gacke* was "still compatible with present conditions." *Id.* And, although the *Honomichl* dissent urged adoption of the rational basis test, the *Honomichl* majority noted that "the court is unable to discern a satisfactory alternative standard to apply." *Id.* We can surely presume that the *Honomichl* majority was familiar with the rational basis test advocated by the dissent but nevertheless rejected it. So, not only does the majority today abandon the two-decade old traditional test in *Gacke,* but it also overrules the relatively recent case of *Honomichl* where the rational basis test alternative, now adopted by the majority, was necessarily rejected, where changed circumstances were not considered sufficient, and *Gacke*'s principles were retained.

The suggestion is made that *Gacke* is an outlier. The cases from Iowa and elsewhere described above show that is not the case. Nonetheless, the majority cites three intermediate appellate court cases for that proposition: *Marsh v. Sandstone North, LLC,* 179 N.E.3d 402, 426–30 (Ill. App. Ct. 2020), *Himsel v. Himsel,* 122 N.E.3d 935, 946–49 (Ind. Ct. App. 2019), and *Rural Empowerment Ass'n for Community Help v. State,* 868 S.E.2d 645, 655 (N.C. Ct. App. 2021).

None of the three cited cases involve a challenge to nuisance immunity under a declaration-of-rights-type provision in state constitutional law. *Marsh* involved equal protection and separation-of-powers challenges to right-to-farm legislation. 179 N.E.3d at 426–30. The musings of the intermediate appellate court on these issues are mildly interesting but irrelevant to the application of a declaration of rights provision such as that contained in article I, section 1 of the Iowa Constitution to a statutory immunity issue. In *Himsel*, an intermediate appellate court found that the right-to-farm law in Indiana was not a taking or a violation of the open court or privileges and immunities clauses of the Indiana Constitution. 122 N.E.3d at 946–50. Again, the *Himsel* court did not discuss the statutory immunity in the context of constitutional inalienable rights analysis. Lastly, *Rural Empowerment Ass'n* held that there was no violation of the law of the land clause or due process clause of the North Carolina Constitution, that the challenged legislation was not a special or private law, and that no deprivation of the right to a jury trial occurred. 868 S.E.2d at 653–55. Again, there was no statutory nuisance immunity and no effort to enforce a declaration of rights clause specifically protecting property interests. These court cases are doing nothing to undermine *Gacke*.

The real question here is whether the unduly oppressive part of the *Gacke* test, firmly rooted in the traditional approach to government regulation and reaffirmed only a few years ago in *Honomichl*, should be abandoned. I say no. Overturning *Gacke* is inconsistent with stare decisis. In any event, oppression of a property owner like that which results from the operation of the immunity

statute in this case should not be permitted because it invades the property interest protected by article I, section 1 of the Iowa Constitution.

For the foregoing reasons, I respectfully dissent.

Oxley, J., joins this dissent.

**McDONALD, Justice (dissenting).**

The Iowa Constitution affords strong protection for private property. Article I, section 9 of the constitution provides that "no person shall be deprived of . . . property[] without due process of law." Iowa Const. art. I, § 9. Article I, section 18 of the constitution provides that "[p]rivate property shall not be taken for public use without just compensation first being made . . . as soon as the damages shall be assessed by a jury." *Id.* art. I, § 18. And article I, section 1 of the constitution provides that "[a]ll men and women . . . have certain inalienable rights—among which are those of . . . acquiring, possessing and protecting property." *Id.* art. I, § 1. These interrelated constitutional provisions preclude the government from immunizing private nuisancers from having to pay full compensation for depriving another of the right to use and enjoy property. At least they did until today. The majority overturns well-supported and well-established caselaw and eviscerates the right to possess, use, enjoy, and protect property. I respectfully dissent.

I.

The majority does not faithfully apply our law regarding rational basis review. The police power is broad but not unlimited. "[T]he police power, like all other powers of the state, is subordinate to the Constitution, and if the Legislature, under the guise of police regulation, transgress the express or clearly implied limits drawn by the Constitution, the courts will hold the act void and of no effect." *McGuire v. Chi., B. & Q. R. Co.,* 108 N.W. 902, 907 (Iowa 1906). In

determining whether the state's exercise of the police power is lawful, this court must analyze the constitutionality of both the end and the means of a statute:

> To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.

*Gravert v. Nebergall*, 539 N.W.2d 184, 186 (Iowa 1995) (quoting *Lawton v. Steele*, 152 U.S. 133, 136–37 (1894)); *see State v. Hartog*, 440 N.W.2d 852, 857 (Iowa 1989). The classical formulation of the test was best articulated by the Great Chief Justice: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *M'Culloch v. Maryland*, 17 U.S. 316, 421 (1819).

The majority conducts only a truncated review of the statutory immunity granted certain animal feeding operations. The majority looks at the legislature's end, concludes the end is legitimate, and probes little further. Pursuant to *Gravert v. Nebergall* and *Lawton v. Steele* and the traditional understanding of judicial review, including rational basis review, more is required. The majority's truncated review is not a faithful application of the relevant law.

II.

In contrast to the majority's truncated review, *Gacke v. Pork Xtra, L.L.C.* faithfully applied the relevant law and examined the constitutionality of both the end and the means of Iowa Code 657.11. 684 N.W.2d 168 (Iowa 2004). *Gacke* concluded the legislature's end—the promotion of certain types of animal feeding

operations—was legitimate but the means—stripping away the constitutional right to protect property by way of a private nuisance action—was not. *Id.* at 179. *Gacke*'s conclusion is better supported by the relevant precedents than the majority's view.

The leading case is *Richards v. Washington Terminal Co.,* 233 U.S. 546 (1914). In *Richards*, the plaintiff brought a nuisance suit against a railroad where "smoke, cinders, and gases enter[ed] the dwelling house and settle[d] upon the furniture and other personal property contained in it, contaminat[ed] the air and render[ed] the house objectionable as a habitation." *Id.* at 550. The plaintiff sought damages for depreciation of the value of his property, damage to his furniture and other belongings, and damage to the structure of his home, as well as damages for "disturbing the peace and slumber of the occupants." *Id.* The United States Supreme Court held that "there [was] a right of recovery." *Id.* at 551. In reaching that conclusion, the Court rejected the railroad's contention that it was immune from suit due to the statute authorizing the construction of the railroad. *Id.* at 551–52. The Court explained that "[t]he courts of England" had concluded that "Parliament, being omnipotent, may authorize the taking of private property for public use without compensation to the owner." *Id.* at 552 (capitalization altered). But, in America, "the legislation . . . must be construed in the light of the provision of the 5th Amendment—'Nor shall private property be taken for public use without just compensation'—and is not to be given an effect inconsistent with its letter or spirit." *Id.* at 552–53 (quoting U.S. Const. amend. V). The Court recognized that there was no taking of land presented in

the case. *See id.* at 552 ("And since he is not wholly excluded from the use and enjoyment of his property, there has been no 'taking' of the land in the ordinary sense."). Nonetheless, the Court "deem[ed] the true rule, *under the 5th Amendment, as under state constitutions containing a similar prohibition*, to be that while the legislature may legalize what otherwise would be a public nuisance, it may not confer immunity from action for a private nuisance." *Id.* at 553 (emphasis added).

Our decision in *Bormann v. Board of Supervisors* directly followed from *Richards*. 584 N.W.2d 309 (Iowa 1998) (en banc). *Bormann* involved a challenge to a statute providing private nuisance immunity to farms operated within a designated agricultural area. *Id.* at 313. In evaluating the statute, the *Bormann* court explained that under Iowa law, "the right to maintain a nuisance is an easement." *Id.* at 315. The private nuisance immunity provision thus "create[d] an easement in the property affected by the nuisance (the servient tenement) in favor of the applicants' land (the dominant tenement). This [was] because the immunity allow[ed] the applicants to do acts on their own land which, were it not for the easement, would constitute a nuisance." *Id.* at 316. Thus, the *Bormann* court concluded the statutory immunity provision was an unconstitutional taking without compensation. *Id.* at 319–20. "[T]he state cannot regulate property so as to insulate the users from potential private nuisance claims without providing just compensation to persons injured by the nuisance." *Id.*

*Gacke* was a logical extension of *Richards* and *Bormann.* Under Iowa law, the proper measure of damages for a permanent nuisance is not limited to "the diminution in the market value of the property." *Weinhold v. Wolff*, 555 N.W.2d 454, 465 (Iowa 1996) (en banc); *see Miller v. Town of Ankeny*, 114 N.W.2d 910, 914 (Iowa 1962). A landowner is also entitled to "recover such other special damages the landowner can prove." *Weinhold*, 555 N.W.2d at 465. This includes "the damages he himself suffers from deprivation of the comfortable enjoyment of his property, and the inconvenience and discomfort suffered by himself and his family, or other affected persons." *Id.* (quoting 58 Am. Jur. 2d *Nuisances* § 296 (1989)); *see Miller*, 114 N.W.2d at 914. *Gacke* concluded that the immunity provision was "unduly oppressive" and thus unconstitutional because it denied the owner of the right to full compensation. 684 N.W.2d at 179. *Gacke*'s conclusion that a landowner is constitutionally entitled to complete relief for private nuisance is wholly consistent with and a logical extension of *Richards* and *Bormann. See id.* at 175.

The majority attempts to justify overruling *Gacke* on the ground that it has been undermined by subsequent decisions. I disagree. This court and the court of appeals have explicitly restated, reaffirmed, and expanded *Gacke. See, e.g.*, *Merrill v. Valley View Swine, LLC*, 941 N.W.2d 10, 17–18 (Iowa 2020) (concluding that the plaintiff's claim was frivolous under the *Gacke* three-factor test); *Honomichl v. Valley View Swine, LLC*, 914 N.W.2d 223, 234–37 (Iowa 2018) (applying principles of stare decisis to hold that defendants had not shown *Gacke* should be overruled); *Dalarna Farms v. Access Energy Coop.*, 792 N.W.2d 656,

663–64 (Iowa 2010) (comparing *Gacke*'s holding to a statute that reduced damages based on comparative fault); *McIlrath v. Prestage Farms of Iowa, L.L.C.*, No. 15–1599, 2016 WL 6902328, at \*3 (Iowa Ct. App. Nov. 23, 2016) (applying *Gacke*'s holding). As we explained just five years ago, the statutory immunity in Iowa Code section 657.11 is an unlawful adjustment of the rights between private parties that violates the inalienable rights clause of the Iowa Constitution:

> In *Gacke,* we further held the immunity was unconstitutional under the inalienable rights clause of the Iowa Constitution, article I, section 1. We reiterated that provision "was intended to secure citizens' pre-existing common law rights (sometimes known as 'natural rights') from unwarranted government restrictions." We concluded the immunity unconstitutionally hindered the Gackes' private property rights for the benefit of the defendant's private business operated as a nuisance.

*Bd. of Water Works Trs. v. Sac Cnty. Bd. of Supervisors*, 890 N.W.2d 50, 71 (Iowa 2017) (citations omitted) (quoting *Gacke,* 684 N.W.2d at 176).

The majority contends that these more specific cases explicitly reaffirming *Gacke* have been undermined by other cases applying rational basis review. The majority's argument is flawed for several reasons. First, the more specific cases explicitly reaffirming *Gacke* would control over the more general cases. Second, and related, none of the cases cited by the majority involve rational basis review of a statute allegedly infringing the enumerated right to acquire, possess, and protect property. *See, e.g., Planned Parenthood of the Heartland, Inc. v. Reynolds*, 962 N.W.2d 37, 46–57 (Iowa 2021) (addressing equal protection and due process claims related to grant funding); *Gray v. Oliver*, 943 N.W.2d 617, 629–33 (Iowa 2020) (addressing due process and equal protection claims related to

assignments of legal malpractice claims); *Clark v. Ins. Co. State of Pa.*, 927 N.W.2d 180, 190–91 (Iowa 2019) (addressing constitutional challenges to personal injury claims and workers' compensation law); *Midwest Check Cashing, Inc. v. Richey*, 728 N.W.2d 396, 402–05 (Iowa 2007) (addressing constitutional challenges to payday loan provisions in the Delayed Deposit Services Licensing Act (Iowa Code chapter 533D)); *Atwood v. Vilsack*, 725 N.W.2d 641, 652 (Iowa 2006) (concluding that "the State's interests in rehabilitating sexually violent predators and protecting the public" outweighed the predator's liberty interest to bail in a civil commitment proceedings).

The majority also attempts to justify overruling Gacke on the ground that other jurisdictions have not followed *Gacke*. But the majority's reliance on persuasive precedents actually undermines its case that *Gacke* was wrongly decided. Quoting *Honomichl v. Valley View Swine, LLC*, the majority correctly notes that "Iowa is the only state to hold that the statutory immunity available under its right-to-farm law is unconstitutional in any manner." 914 N.W.2d at 233 & n.2 (collecting cases rejecting constitutional challenges). What the majority fails to note, however, is that Iowa property and nuisance law is unique insofar as Iowa law recognizes that the right to maintain a nuisance is an easement. *See Lindsey v. DeGroot*, 898 N.E.2d 1251, 1259 (Ind. Ct. App. 2009) ("We note that like the Idaho and Texas courts, we have found nothing to suggest that Indiana has adopted the seemingly unique Iowa holding that the right to maintain a nuisance is an easement."); N. William Hines, *CAFOs and U.S. Law*, 107 Iowa L. Rev. Online 19, 55 (2022) [hereinafter Hines, *CAFOs*] (explaining

Iowa law is unique because, "among the 50 states, only the Iowa courts apply this easement analysis" to nuisance claims). Given the unique nature of our property and nuisance law, it should be no surprise that constitutional protections for property rights apply differently in Iowa.

The majority also fails to note that Iowa's immunity provision is an outlier when compared to other states. The Iowa statute wholly deprives a property owner of the right to assert a private nuisance action and seek full compensation. *See* Iowa Code § 657.11(2) (2020). In contrast, other states generally have enacted a statute of repose with respect to private nuisance actions. *See, e.g.*, *Overgaard v. Rock Cnty. Bd. of Comm'rs*, No. Civ.A.02–601 (DWF/AJB), 2003 WL 21744235, at *7 (D. Minn. July 25, 2003) ("In Minnesota, the Right to Farm Act creates a two-year window before the immunity from nuisance suit applies. This is different from Iowa, where the Right to Farm Act creates immediate immunity from nuisance suit."); *Lindsey*, 898 N.E.2d at 1259 (discussing the one-year period of repose under Indiana law); Terence J. Centner, *Governments and Unconstitutional Takings: When Do Right-to-Farm Laws Go Too Far*, 33 B.C. Envtl. Aff. L. Rev. 87, 146 (2006) (discussing state right-to-farm laws and stating that compared to other states, the "Iowa statutes may have crossed th[e] threshold" as an "unconstitutional taking"); Beau R. Morgan, Note, *Iowa and Right to Farm: An Analysis of the Constitutionality of Right to Farm Statutes Across the United States*, 53 Creighton L. Rev. 623, 637 (2020) (surveying right-to-farm statutes, stating the "Iowa statute is unlike many other right to farm statutes," and stating

"[u]nlike other states, neighboring property owners in Iowa have no opportunity or timeframe to bring a nuisance claim"). As one treatise explains:

> The Iowa statutes involved in *Bormann* and [*Gacke*] differ from most states' right to farm laws in that they neither required the agricultural operation to have been established before the neighboring nonagricultural uses, nor provided a statute of repose giving neighbors a window of time during which they could bring a nuisance claim against a newly established agricultural operation. **In other words, the statutes granted agricultural operations a nearly absolute right to create a nuisance, regardless of whether the neighbors "came to the nuisance" or acquiesced in its creation. Because of the exceptional nuisance protection provided by the Iowa laws, courts have distinguished other states' right to farm laws and found them not to constitute unlawful takings**.

Patricia E. Salkin, 4 *American Law of Zoning* § 33:5, Westlaw (5th ed. database updated May 2022) (emphasis added). It should come as no surprise that this court in *Bormann* and *Gacke* reached a different result than courts in other jurisdictions since the Iowa statute at issue is an extreme deprivation of rights not even attempted in other jurisdictions.

III.

Rather than overruling *Gacke,* I would reaffirm the core of *Gacke* and hold the private nuisance immunity in Iowa Code section 657.11 is per se unduly oppressive under *Gacke*'s three-part test and is thus per se unconstitutional. *See* Julian Conrad Juergensmeyer et al., *Land Use Planning and Development Regulation Law* § 14:7, Westlaw (3d ed. database updated Nov. 2021) ("[T]he legislature is limited in its ability to legalize a private nuisance . . . ."). This conclusion arises necessarily out of a proper understanding of fundamental

principles of property and nuisance law in Iowa and a proper understanding of the police power.

Under Iowa law, property is not merely the corporeal thing itself; it is the bundle of rights associated with the corporeal thing. This understanding of property is codified at Iowa Code section 4.1(13), which defines "land," "real estate," and "real property" to "include lands, tenements, hereditaments, and all rights thereto and interests therein, equitable as well as legal." The statutory definition merely codified the definition of property repeatedly set forth in our precedents:

> "A little reflection, however, will suffice to convince any one that property is not the corporeal thing itself of which it is predicated, but certain rights in or over the thing. . . . We must, therefore, look beyond the thing itself, beyond the mere corporeal object, for the true idea of property. Property may be defined as certain rights in things which pertain to persons and which are created and sanctioned by law. These rights are the right of use, the right of exclusion and the right of disposition." . . . "These rights, wherever they exist, and to the extent to which they are secured by law, are part and parcel of the owner's property in land."

*Harrison–Pottawattamie Drainage Dist. No. 1 v. State*, 156 N.W.2d 835, 838–39, (Iowa 1968) (first omission in original) (quoting *Liddick v. City of Council Bluffs*, 5 N.W.2d 361, 372 (Iowa 1942)); *see Bormann*, 584 N.W.2d at 315; *Simpson v. Iowa State Highway Comm'n*, 195 N.W.2d 528, 535 (Iowa 1972); *Liddick*, 5 N.W.2d at 374; *Wapsie Power & Light Co. v. City of Tipton*, 193 N.W. 643, 645 (Iowa 1923).

The bundle of property rights has been defined and refined over time. Included among the intangible property rights in this bundle are "the right of user and enjoyment, right of exclusion, right of disposition, and . . . [the right]

to be protected from unreasonable uses of neighboring property." *Liddick*, 5 N.W.2d at 374. Excluded from the intangible property rights in this bundle is the right to use one's property to injure others. *See Gray*, 943 N.W.2d at 631–32; *Snyder v. Bernstein Bros.*, 208 N.W. 503, 504 (Iowa 1926); *McGuire*, 108 N.W. at 907; *In re Ruth*, 32 Iowa 250, 252 (1871); *Wallace v. City of Muscatine*, 4 Greene 373, 375 (Iowa 1854). "[E]very holder of property . . . holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community." *McGill v. Pintsch Compressing Co.*, 118 N.W. 786, 788 (Iowa 1908) (quoting *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53, 84–85 (1851)). This is true even where the offending property owner exercised care to prevent injury. *See Rhoades v. Cook*, 98 N.W. 122, 123 (Iowa 1904); *Millhiser v. Willard*, 65 N.W. 325, 326 (Iowa 1895).

The law of nuisance protects the intangible property right of user and enjoyment and the right to be protected from unreasonable uses of neighboring property. Iowa Code section 657.1(1) defines a nuisance as "[w]hatever is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere unreasonably with the comfortable enjoyment of life or property." *See also* 2 William Blackstone, *Commentaries* *215–16 (defining nuisance as a "species of real injuries to a man's lands and tenements" or anything that "worketh hurt, inconvenience, or damage" to property).

The keeping or production of animals that pollute the air is the prototypical infringement of private property by nuisance. As explained in the *Commentaries*, "Also if a person keeps his hogs, or other noisome animals, so near the house of another that the stench of them incommodes him and makes the air unwholesome, this is an injurious nuisance, as it tends to deprive him of the use and benefit of his house." *Id.* at *216–17 (footnote omitted). It is not necessary for the injured property owner to show "that the smell should be unwholesome: it is enough if it renders the enjoyment of life and property uncomfortable." *Id.* *217 n.2 (quoting *Rex v. White*, 1 Burr. 337). The injured party is entitled to damages "for the injury sustained." *Id.* at *220.

The seminal nuisance case dates from 1610. *Aldred's Case*, (1610) 77 Eng. Rep. 816 (KB). In that case, William Aldred sued Thomas Benton for injunctive relief and for damages arising out of Benton's keeping of a pigsty. *Id.* at 816. Aldred claimed the odor emanating from the sty made the air unbreathable and blocked his natural light. *Id.* at 817. Benton defended against the suit on the ground that his farm operation was "necessary for the sustenance of man" and on the ground that Aldred "ought not to have so delicate a nose." *Id.* The court rejected the defenses, relying on the ancient principle *sic utere tuo ut alienum non lædas*, which means one must use one's property in a manner that does not injure other people's property. *Id.* at 821. The court concluded Aldred was entitled to damages because Benton's sty interfered with the basic necessities of life, including the ability to breathe "wholesome air." *Id.* Aldred was entitled to

damages even though there was no physical invasion of or damage to Aldred's property. *See id.*

Between the time of the *Aldred* decision and Iowa's founding, it was black letter law in America that offensive smells from animal agriculture could constitute both a public and private nuisance. *See, e.g., Whitney v. Bartholomew*, 21 Conn. 213, 218–19 (1851); *Smiths v. McConathy*, 11 Mo. 517, 518 (1848); *Catlin v. Valentine*, 9 Paige Ch. 575, 576 (N.Y. Ch. 1842); *Shaw v. Kennedy*, 4 N.C. (Taylor) 591, 592 (1817); *Commonwealth v. Van Sickle*, 1 Brightly 69, 71 (Pa. 1845); *Burditt v. Swenson*, 17 Tex. 489, 502 (1856).

The law in Iowa was no different. In *State v. Kaster*, this court upheld a verdict finding the defendant's hog pen was a nuisance. 35 Iowa 221, 225–26 (1872). The confinement "occasioned noxious exhalations, offensive smells, unwholesome smells, so that the air was then and there greatly corrupted and infected thereby, and other annoyances becoming and being dangerous to the health, comfort and property of the good people residing in that immediate neighborhood." *Id.* at 223. This court rejected the defendant's contention that he should be allowed to show the public benefitted from his animal operation as a defense to the action. *Id.* at 224 (stating a nuisance defendant "will not be permitted to show that the public benefit resulting from his act is equal to the public inconvenience which arises from it" (quoting *Rex v. Ward*, 4 Adolph. & E. 384 (31 Eng. Com. L. 92))); *see also Valasek v. Baer*, 401 N.W.2d 33, 35 (Iowa 1987) ("The fact that defendant's hog operation was a lawful business and was being carried on in accordance with accepted standards does not impact on the

finding of a nuisance. A lawful business, properly conducted, may still constitute a nuisance if it interferes with another's use of his own property.").

In *Shiras v. Olinger*, this court held that a stable was not per se a nuisance. 50 Iowa 571, 575 (1879). However, the stable could become a nuisance depending on its manner of operation. *Id.* In that case, the evidence was sufficient to establish a nuisance:

> [I]n regard to the plaintiff's house it is clearly established that offensive odors were almost constantly perceived within it, and that sometimes they were such as to render it necessary to keep the doors and windows closed upon the east and south sides. Expert evidence was introduced to the effect that while it is not clearly established that gases from a livery stable generate any specific disease, they are regarded by the medical profession as noxious if allowed to permeate residences, increasing exposure to disease, especially in case of epidemics, and constituting generally in disease an aggravating element. Evidence was also introduced showing that sickness in the plaintiff's family and other families near the stable had probably occurred or been aggravated by gases from the stable.

*Id.* at 573.

In accord with *Kaster* and *Shiras*, this court has repeatedly held that barns, pens, and other animal operations were nuisances if they caused harm or injury to others or otherwise unreasonably interfered with others' equal right to possess, use, and enjoy their property. *See, e.g.*, *Patz v. Farmegg Prods., Inc.*, 196 N.W.2d 557, 559–60, 562 (Iowa 1972) (holding an industrial poultry operation was "clearly" a nuisance and stating that "[t]he raising of over 80,000 chickens in one facility is not incident to rural life"); *Rhoades*, 98 N.W. at 123 ("Under our statutes, anything which produces noxious exhalations, offensive smells, or other annoyances injurious to the health, comfort, or property of individuals, is a nuisance. It is not necessary that these odors be deleterious to

health. It is sufficient if they offend the senses in such a manner as to produce actual discomfort."); *Trulock v. Merte*, 34 N.W. 307, 309 (Iowa 1887) ("The evidence shows that they kept the pen as clean as was possible, yet offensive smells arose from it, which penetrated plaintiff's house. The pen, when used for that purpose, would necessarily be a nuisance, and plaintiff is entitled to have it abated."); *Cook v. Benson*, 17 N.W. 470, 472 (Iowa 1883) (holding the evidence was sufficient to establish a nuisance where a barn emitted "smells and vapors" and the plaintiff was hindered by "flies and effluvia from that barn").

In light of these precedents, this court correctly concluded in *Gacke* that granting certain animal feeding operations immunity from private nuisance actions was unduly oppressive and not a constitutional means of exercising the police power. "The spirit which pervades the police power is closely related to that which is embodied in the common-law maxim, 'Sic utere tuo alienum non lædas.'" *McGuire*, 108 N.W. at 907. That is, the police power, properly understood, includes the power to prevent harmful uses of property but not the power to facilitate harmful uses of property that infringe on the property rights of others. *See May's Drug Stores, Inc. v. State Tax Comm'n*, 45 N.W.2d 245, 250–51 (stating the police power includes "such reasonable supervision and regulation as the state may impose, to insure observance of the individual citizen of the duty to use his property and exercise his rights and privileges *with due regard to the personal and property rights and privileges of others*" (emphasis added)). This was the understanding of the police power at the time of Iowa's founding. *See* Thomas M. Cooley, *A Treatise on the Constitutional Limitations*

*Which Rest upon the Legislative Power of the States of the American Union* 572–74 (1868) ("According to the maxim, *Sic utere tuo ut alienum non lædas*, which being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others." (quoting *Thorpe v. Rutland & Burlington R.R.*, 27 Vt. 140, 149 (1855))). This maxim is inherent in the very concept of property rights: property rights do not include a right to use one's property to injure another. *See Gray*, 943 N.W.2d at 631–32; *Snyder*, 208 N.W. at 504; *McGill*, 118 N.W. at 788; *In re Ruth*, 32 Iowa at 251–52; *Wallace*, 4 Greene at 375; *Aldred's Case*, 77 Eng. Rep. at 821. But the statutory immunity granted in Iowa Code section 657.11 is wholly contrary to this maxim. It strips one property owner of the right "to be protected from unreasonable uses of neighboring property." *Liddick*, 5 N.W.2d at 374. And it grants another property owner the right to injure his neighbor. This is outside the police power, and this our law does not allow. *See, e.g., In re Ruth*, 32 Iowa at 252 ("[N]either can property be acquired, enjoyed and disposed of to the peril of the lives, health, happiness and property of others.").[17]

Intimately related to this point, this court correctly concluded in *Gacke* that granting immunity to private nuisancers deprives injured property owners of the constitutionally enumerated right to "protect property" through the use of the legal process. To flesh out this point further, it is important to distinguish

---

[17] *See generally* Sam Spiegelman & Gregory C. Sisk, Cedar Point: *Lockean Property and the Search for a Lost Liberalism*, 2021 Cato Sup. Ct. Rev. 165 (discussing the limits of the police power).

between public nuisances and private nuisances. "There are public nuisances, and there are private nuisances. A public or common nuisance is a species of catchall criminal offenses, consisting of an interference with the rights of a community at large. . . . A private nuisance, on the other hand, is a civil wrong based on a disturbance of rights in land." *Guzman v. Des Moines Hotel Partners, Ltd.*, 489 N.W.2d 7, 10 (Iowa 1992). There can be no doubt that the state may define what does and what does not constitute a public nuisance. What the state may not do, however, is immunize a private nuisance because doing so deprives the injured property owner of the "right of user and enjoyment" and the right "to be protected from unreasonable uses of neighboring property." *Liddick*, 5 N.W.2d at 374; *see Richards*, 233 U.S. at 553 ("[W]hile the legislature may legalize what otherwise would be a public nuisance, it may not confer immunity from action for a private nuisance . . . ."); Note, *Nuisance and Legislative Authorization*, 52 Colum. L. Rev. 781, 784–85 (1952) ("[T]he legislature has no power whatever to privilege a private nuisance.").

Our cases have repeatedly distinguished between public and private nuisance and have noted how this distinction limits the state's exercise of the police power with respect to immunizing private nuisance:

> It is sometimes said that that which is authorized by law cannot be a nuisance. In one sense, that is true. In another, it is an incorrect statement of the law. An act done under such circumstances, and within the proper limits of the power given, would not constitute a public nuisance for which one might be indicted, **but might be a private nuisance; and damages resulting therefrom, as a private nuisance, might be recovered, and in such a case the legislative grant would be no protection**.

*Churchill v. Burlington Water Co.*, 62 N.W. 646, 646–47 (Iowa 1895) (emphasis added); *see Richards*, 233 U.S. at 553; *Dalarna Farms*, 792 N.W.2d at 663 ("[A] statute purporting to immunize a defendant who creates or maintains a nuisance from liability to another for the value of the diminution of the property caused by the nuisance is unconstitutional."); *Simpson*, 195 N.W.2d at 535 ("The State is constitutionally prohibited from restricting the rights of adjacent landowners or enlarging their duties in the absence of condemnation proceedings which would include such restrictions or enlargements."); *Bushnell v. Robeson*, 17 N.W. 888, 890 (Iowa 1883) ("A nuisance may be both public and private. That is to say, a nuisance may affect the public, and yet an individual may be injuriously affected in such capacity as distinguished from the public at large. When this is the case, he is entitled to relief." (citation omitted)).

Gordon Garrison has alleged precisely the type of harm necessary to support his claim that the defendants infringed his right to be free from unreasonable uses of neighboring property. Evidence supporting Garrison's nuisance claim against the defendants included an odor calendar showing his property was subject to odor from hogs on about one-third of all days. Garrison reported experiencing nausea and dizziness from the odor and reported the odor sometimes forced him to stop working outdoors. Nearby landowners corroborated Garrison's complaints about the odor. Garrison's allegations would be sufficient to allow a jury to find the defendants' confined animal feeding operation (CAFO) constitutes a nuisance because it interferes with Garrison's

"private use and enjoyment of his land." *Larsen v. McDonald*, 212 N.W.2d 505, 508 (Iowa 1973).

Garrison's experience is not unusual. The damage, degradation, and destruction caused by industrial animal feeding operations is well-documented. *See, e.g.*, *McKiver v. Murphy–Brown, LLC*, 980 F.3d 937, 980–83 (4th Cir. 2020) (Wilkinson, J., concurring) (discussing the harms caused by industrial hog farming and concluding that "[t]he scale of industrial hog farming is no warrant to ride roughshod over the property rights of neighbors, the health of workers and community members, and the lives of the hogs themselves"); Hines, *CAFOs*, 107 Iowa L. Rev. Online at 21 ("The threats CAFOs can pose to the health, property rights, and general well-being of neighboring landowners . . . are well described and documented . . . ."); N. William Hines, *Here We Go Again: A Third Legislative Attempt to Protect Polluting Iowa CAFOs from Neighbors' Nuisance Actions*, 103 Iowa L. Rev. Online 41, 44–46 (2018) (discussing public health concerns and environmental problems caused by CAFOs); Michelle Johnson-Weider, *From Factory Farming to a Sustainable Food System: A Legislative Approach*, 32 Geo. Env't L. Rev. 685, 688–701 (2020) (discussing harms to humans and the environment caused by CAFOs); Charlie Hope-D'Anieri, *'Towns Just Turned to Dust': How Factory Hog Farms Help Hollow Out Rural Communities*, Guardian (May 5, 2022), https://www.theguardian.com/environment/2022/may/05/us-industrial-hog-farming-rural-towns [https://perma.cc/V84R-3YRT]; *The Economic Cost of Food Monopolies: The Hog Bosses*, Food & Water Watch (May 2022),

https://www.foodandwaterwatch.org/2022/05/05/food-monopolies-hog-factory-farms [https://perma.cc/CK62-983R].

The concurrence in this case states that recognition of these harms is merely a policy objection to the statutory immunity, but the concurrence misses the point. The statutory immunity provided to certain animal feeding operations is not unconstitutional because it is bad policy; it is unconstitutional because immunizing private nuisancers from paying damages caused by their conduct is contrary to Iowa's legal history, Iowa's property law, Iowa's nuisance law, Iowa's precedents regarding the lawful exercise of the police power, and Iowa's interrelated constitutional provisions protecting private property. What other state courts have done is immaterial to the question presented in this case. Under Iowa law, the state may validly exercise its police powers in a manner that "licenses no man to interfere with the lands or goods of another." *McMillen v. Boyles*, 6 Iowa (Clarke) 304, 315 (1858). But when the legislature exercises its police powers to allow one person to profit by damaging, degrading, and destroying the property and property rights of another, the legislature has exceeded its constitutional authority:

> [T]he exercise of police power to maintain the respective rights of men guaranteed by the Constitution has been held to be within the contemplation of the makers of the Constitution and permissible under its terms, even though rights are thereby restrained and the use of property restricted. **But the end of police power is reached when the rights of others have been protected, and when rights are cut down in order that others may profit thereby, the limit of police power has been exceeded, for then the guaranty of the Constitution has been violated**.

*Des Moines Joint Stock Land Bank of Des Moines v. Nordholm*, 253 N.W. 701, 727–28 (Iowa 1934) (Claussen, C.J., dissenting) (emphasis added).[18]

Quite simply, "the legislature or governmental agencies cannot constitutionally confer upon individuals or private corporations, acting primarily for their own profit, although for public benefit as well, any right to deprive persons of the lawful enjoyment of their property." *Hyde v. Somerset Air Serv., Inc.*, 61 A.2d 645, 647 (N.J. Super. Ct. Ch. Div. 1948). "The great principle of the common law . . . so to use one's property as not to injure others, forbids any other application or use of the rights and powers conferred." *Balt. & P. R. Co. v. Fifth Baptist Church*, 108 U.S. 317, 331 (1883).

IV.

The Iowa Constitution provides that "[a]ll men and women . . . have certain inalienable rights—among which are those of . . . acquiring, possessing and protecting property." Iowa Const. art. I, § 1. In the end, the legal question presented in this case is a simple one: does the constitution mean what it says? Do the men and women of this state have the constitutional right to protect their

---

[18]Noted constitutional law scholar Richard Epstein agrees with this view, explaining that the grant of immunity from private nuisance suits is wholly inconsistent with the police power and the constitutional plan:

> The proper ends under the police power are those of the private law of nuisance, no more and no less. . . . It is not acceptable, either politically or constitutionally, to limit the pollution from one factory while allowing its next-door competitor to operate free of legal restraint. It is instead necessary to make sure that differential systems of enforcement do not result in the hidden wealth transfers that are prohibited under the Takings Clause. The evenhanded enforcement of the nuisance law is an essential ingredient of the proper constitutional plan.

Richard A. Epstein, *The Classical Liberal Constitution: The Uncertain Quest for Limited Government* 353 (2014).

property? The text of the constitution, precedent, and history say yes. The majority says no. I respectfully dissent.

Oxley, J., joins this dissent.